UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- X
:
COKINETIC SYSTEMS, CORP.,                                             :     **Index No.:** 17-cv-1527
:
Plaintiff,                                  :
:
:
:
:
-against-                                    :
:
:     **COMPLAINT**
PANASONIC AVIONICS CORPORATION,                                      :
:
Defendant.                                   :     **JURY TRIAL DEMANDED**
:
--------------------------------------------------------------------- X

Plaintiff CoKinetic Systems, Corp. ("CoKinetic"), by its attorneys Crosby & Higgins

LLP, complaining of Defendant Panasonic Avionics Corporation ("Panasonic"), alleges upon

information and belief as follows:

## PRELIMINARY STATEMENT

1.      This dispute arises from Panasonic's long-running scheme to destroy competition

and force CoKinetic from the worldwide market for in-flight entertainment ("IFE") software

services on Panasonic's IFE hardware systems.

2.      As set forth below, Panasonic has violated open source licensing requirements,

breached contractual obligations, abused regulatory processes, engaged in acts of corporate

espionage, defamed CoKinetic and maliciously sabotaged its products, deliberately damaged its

own airline customers' IFE hardware systems in order to disrupt and interfere with CoKinetic's

business relationships, purportedly paid commercial bribes, and otherwise employed unlawful

means to monopolize the market for interactive software and media content services used by

1

Case 1:17-cv-01527-PKC   Document 1   Filed 03/01/17   Page 2 of 80


commercial airline carriers with Panasonic's IFE hardware (the "Panasonic IFE Software and Media Services Market").

3.      After a decade-long assault on fair competition, the day of reckoning for Panasonic and its senior management team has now arrived. Indeed, on February 2, 2017, Panasonic Corporation, which is the Japanese parent company of Panasonic Avionics Corporation, publicly announced that the United States Department of Justice ("DOJ") and the United States Securities and Exchange Commission ("SEC") are currently investigating Panasonic in connection with violations of the Foreign Corrupt Practices Act ("FCPA") and other securities-related laws.

4.      Panasonic Corporation also publicly disclosed that it "has been cooperating with authorities, and has recently engaged in discussions with the DOJ and SEC with a view towards resolving the matter." On the same day, Panasonic Corporation of North America, which appears to control and direct all of the activities of Panasonic Avionics Corporation, including the acts complained of herein, announced without any advance notice or explanation that Panasonic's long-time Chief Executive Officer, Paul Margis, had left the company, effective immediately, along with the Chief Financial Officer, Paul Bottiaux.

5.      Incredibly, this is not the first time that Panasonic Corporation and its subsidiaries have become embroiled in a DOJ investigation concerning anticompetitive conduct. Indeed, Panasonic Corporation has been the subject of multiple criminal investigations over the past few years, leading to guilty pleas and substantial criminal fines. For example, in 2010, Panasonic Corporation pled guilty to participating in an international price fixing conspiracy in the market for refrigerant compressors used for household refrigerators and freezers, resulting in a $49 million criminal fine. Similarly, in 2013, Panasonic Corporation and one of its subsidiaries,

SANYO Electric Co. Ltd. ("SANYO"), pled guilty to two separate price-fixing conspiracies in violation of U.S. antitrust laws involving automotive parts and battery cells. Once again, Panasonic Corporation agreed to pay a $45.8 million criminal fine for its anticompetitive conduct.

6.     Panasonic's latest possible federal prosecution, this time involving violations of the FCPA and securities-related laws, while not surprising in light of Panasonic Corporation's troubled history of anticompetitive behavior and the wrongful conduct described in detail below, only begins to draw back the curtain on the pervasive, anticompetitive current running through the corridors of Panasonic, guiding every action the company has taken to monopolize the Panasonic IFE Software and Media Services Market.

7.     To summarize, Panasonic has succeeded in monopolizing the Panasonic IFE Software and Media Services Market by, among other things, deliberately refusing to distribute source code for its open-source Linux-based operating system and intertwined "core" software, which controls access to the basic functions of Panasonic IFE hardware systems (collectively, the "Linux-Based Panasonic Core Software").

8.     Panasonic refuses to publicly disclose the source code to the Linux-Based Panasonic Core Software even though its own right to install, use and modify Linux on Panasonic IFE hardware systems is conditioned on free third-party distribution of the source code to the Linux-Based Panasonic Core Software, pursuant to Version 2 of the GNU General Public License ("GPL").

9.     More specifically, Panasonic has built the Linux-Based Panasonic Core Software using the open-source Linux kernel, which is clearly governed by the GPL, together with Panasonic's own modified Linux modules, which are likewise governed by the GPL. Indeed,

Panasonic has itself affirmatively identified its own modified modules as being subject to the GPL, because the original Linux modules were specifically designed to generate warning messages if other code is linked with or otherwise combined with the Linux modules that are not licensed under the GPL.  To suppress these warnings, Panasonic willfully acted to insert code into its own modules to indicate that they were licensed under the GPL.

10.     Panasonic has incorporated a massive amount of open source modules, programs, and libraries into the Linux-Based Panasonic Core Software, without distributing notices or source code to the Linux-Based Panasonic Core Software, or even to any part of it, including, for example "GStreamer," which, on information and belief, Panasonic modifies to implement video-streaming functionality on its IFE Hardware systems, along with countless others.  By deliberately refusing to distribute the source code to the Linux-Based Panasonic Core Software in accordance with its GPL obligations, Panasonic intentionally deprives competitors in the market from having the ability to develop software that can access the basic features and capabilities of Panasonic IFE Hardware.

11.     Panasonic's anticompetitive refusal to distribute the source code to the Linux-Based Panasonic Core Software voids its own GPL license and potentially exposes Panasonic to billions of dollars in statutory damages for hundreds of thousands of hardware installations that willfully infringe copyrights belonging to hundreds or even thousands of software developers that freely contributed source code to Linux.

12.     Without access to the source code for the Linux-Based Panasonic Core Software, competitors must rely on Panasonic's willingness to deal with them in good faith by providing application programming interfaces ("APIs") for Panasonic's IFE hardware, in order for these companies to offer software services to airlines using Panasonic's IFE hardware.

13.     Panasonic, however, uses control over the source code for the Linux-Based Panasonic Core Software and selective distribution of APIs in order to deliberately block competitor products, stifle industry innovation, and restrict airline independence, thereby allowing Panasonic to maintain and extend its monopoly control over the Panasonic IFE Software and Media Services Market.

14.     In other words, Panasonic blocks companies like CoKinetic from competing freely and offering airlines truly independent software solutions—including, critically, the option of removing all of Panasonic's software from Panasonic IFE hardware and simply replacing it with software and media solutions developed and controlled by the airline customer, which would instantly free them from Panasonic processes and break the monopoly in the Panasonic IFE Software and Media Services Market.

15.     Panasonic also is able to use its control over the Linux-Based Panasonic Core Software in order to make ongoing, undisclosed, and often malicious modifications to its source code, deliberately "breaking" Panasonic's own APIs in order to purposely and maliciously sabotage the performance of third-party software products that Panasonic deems a competitive threat—particularly CoKinetic software.

16.     More to the point, Panasonic has routinely engaged in patently unlawful—indeed shocking—practices by deliberately degrading and damaging IFE hardware systems owned by Panasonic's own airline customers, including Emirates Airlines ("Emirates"), Delta Air Lines, Inc. ("Delta"), Virgin America, Inc. ("Virgin America"), United Airlines, Inc. ("United Airlines"), and others, all in order to create the appearance that only Panasonic is able to provide reliable software services on Panasonic IFE hardware, thus destroying competition and forcing airlines to purchase inferior products sold at monopolistic prices.

17.     In addition to the foregoing, Panasonic also engages in other anticompetitive conduct and wrongful means in order to maintain monopoly control over the Panasonic IFE Software and Media Services Market, including abusing Federal Aviation Administration ("FAA") regulatory processes, illegally tying its software services to IFE hardware, and otherwise refusing to deal with competitors.

18.     Panasonic also directs anticompetitive and other unlawful conduct specifically at CoKinetic.  As discussed below, CoKinetic was founded in 2001 to commercialize a patented user interface technology that revolutionized software application development.  Using its patented technology, CoKinetic developed "AirPlay," which is the software runtime engine that now drives its IFE software platform.

19.     In 2004, CoKinetic began working with Virgin America to install and run AirPlay on Virgin America's newly purchased aircraft.  At the time, Virgin America was in the early stages of preparing to launch its airline service.

20.     As part of its brand strategy, Virgin America sought to distinguish itself from competitors by equipping its aircraft with the best IFE system in the domestic market.  Virgin America envisioned an innovative and evolving entertainment system offering a host of features and capabilities, most of which did not exist at the time.

21.     Virgin America eventually concluded that it could not accomplish its product vision using existing IFE software.  As a result, Virgin America decided to license Airplay from CoKinetic pursuant to a Software License Agreement, dated April 16, 2004 (the "Virgin America SLA"), and hired CoKinetic to help develop what would become Virgin America's award winning "Red" IFE system.

22.     Critically, the relationship between Virgin America and CoKinetic was only possible because Virgin America adamantly required Panasonic to cooperate with CoKinetic, Virgin America's designated IFE software services provider, as a condition to Virgin America's agreement to purchase IFE hardware, thus requiring Panasonic to provide CoKinetic with the APIs necessary to integrate AirPlay with Panasonic's IFE hardware.

23.     On information and belief, CoKinetic's agreement with Virgin America was the first of its kind in the market—one in which an independent, competing third-party software services provider developed IFE software directly for an airline, to be used on that airline's Panasonic IFE hardware system.

24.     In 2006, CoKinetic successfully launched the AirPlay software platform on Virgin America's Panasonic IFE hardware, producing an avalanche of accolades and industry awards for Virgin America's "Red" IFE system and showcasing to the market what could be accomplished when an airline chooses to disaggregate the purchase of IFE hardware systems from the purchase of software services.

25.     Panasonic was quick to recognize the implications of CoKinetic's success with Virgin America and the very real long-term competitive threat that AirPlay software posed to Panasonic's ability to maintain monopoly control over the Panasonic IFE Software and Media Services Market.

26.     Acting to preempt the emerging competitive threat from CoKinetic, Panasonic schemed to buy itself time by negotiating with CoKinetic for what was supposed to be an exclusive license to use AirPlay, together with Panasonic's contractual obligation to use best efforts to sell AirPlay to Panasonic's IFE hardware customers.

7

27.     On October 2, 2006, Panasonic and CoKinetic entered into a Software License Agreement (the "Panasonic SLA") for Panasonic to license and distribute CoKinetic's AirPlay software in conjunction with the sale of Panasonic's IFE hardware.  Pursuant to the terms of the Panasonic SLA, Panasonic acquired the exclusive right to license and distribute AirPlay software, subject to certain milestones and continuing minimum licensing thresholds.

28.     Among other things, the Panasonic SLA provided that Panasonic "will provide all necessary hardware, technical materials, application programming interfaces, required licenses, and other assistance that is necessary to permit CoKinetic to create [versions of AirPlay for each current and future Panasonic hardware platform]."

29.     The Panasonic SLA licensing minimums began with Panasonic's contractual obligation to designate three airline customers for initial acceptance testing and fleet deployment of CoKinetic's AirPlay software.  The first of the three airlines was Emirates, which CoKinetic had begun working on prior to execution of the Panasonic SLA, leaving two more airlines to be designated for initial acceptance testing.

30.     Also on October 2, 2006, Panasonic and CoKinetic entered into a Co-Marketing and Revenue Sharing Agreement (the "Co-Marketing Agreement").  Among other things, the Co-Marketing Agreement provided that "CoKinetic and Panasonic will act in good faith and use their best efforts to collaborate to sell Airplay directly to Panasonic's Customers."

31.     As further detailed below, it is now clear that Panasonic had no intention of performing its contractual obligations pursuant to the Panasonic SLA and Co-Marketing Agreement in good faith.

32.     In fact, Panasonic's true intention was to use any means necessary to cause AirPlay to fail in the market, including by deliberately interfering with and sabotaging

8

CoKinetic's performance on Emirates, which was widely considered to be the most complex and demanding IFE program in the world.

33.     In retrospect, Panasonic's goal was unmistakable—to prevent AirPlay from gaining market-wide acceptance, and to block CoKinetic from offering airlines a truly independent software solution.

34.     Almost immediately after executing the Panasonic SLA, Panasonic began materially breaching its obligations to CoKinetic by, among other things, failing for many months to pay CoKinetic as agreed in the Panasonic SLA, thus starving CoKinetic of revenues, and also refusing to designate the remaining two airline customers required for initial acceptance testing and deployment of AirPlay.

35.     Only after CoKinetic served repeated notices of breach and thereafter notice of termination did Panasonic reluctantly agree to add United Airlines and Air New Zealand Ltd. ("Air New Zealand") to the AirPlay platform.

36.     Meanwhile, Panasonic continuously refused to provide CoKinetic with all technical information necessary to make AirPlay compatible with Panasonic hardware, as expressly required by the Panasonic SLA.

37.     Worse still, Panasonic began deliberately making constant changes to the Linux-Based Panasonic Core Software without ever notifying CoKinetic or giving CoKinetic an opportunity to update AirPlay for compatibility, purposely impairing the performance of CoKinetic's IFE software and sabotaging CoKinetic's relationship with the three initial launch customers, especially Emirates.

38.     By August 17, 2007, less than a year after entering into the Panasonic SLA, CoKinetic was forced to send Panasonic formal notice of termination, given Panasonic's

"repeated acts of bad faith and anticompetitive actions towards CoKinetic in the marketplace over the past several months, including product disparagement, refusal to deal, tortious interference, and other wrongful acts."

39.     On September 6, 2007, CoKinetic offered, without waiver, to revoke its August 17, 2007 termination, in exchange for Panasonic's express agreement to, among other things, "provide CoKinetic with access to all necessary development hardware and API data," and "halt any product disparagement or any other anticompetitive conduct and promise[] to honor its obligation to act in good faith and cooperate with CoKinetic in the sale of AirPlay directly to [Panasonic's] customers."

40.     On September 7, 2007, Panasonic unconditionally accepted CoKinetic's offer and expressly agreed "that [Panasonic] will not engage in any such disparagement or anticompetitive conduct in the future," and agreed "to each and every one of the items set out in [CoKinetic's] September 6, 2007 letter."

41.     Despite Panasonic's unambiguous contractual obligation not to disparage or engage in anticompetitive conduct, and despite promising to perform its existing contractual obligations, Panasonic has and repeatedly continues to breach the Panasonic SLA and the September 7, 2007 letter agreement.

42.     Similarly, almost immediately after executing the Co-Marketing Agreement, Panasonic began materially breaching its obligations to CoKinetic by, among other things, failing to use best efforts to promote and sell AirPlay.

43.     Rather than use best efforts to promote and sell AirPlay—as it is obligated to do under the Co-Marketing Agreement—Panasonic devoted its energy to conspiring to take back customers who had agreed to license CoKinetic software through the Panasonic SLA,

10

specifically Emirates, United Airlines, and Air New Zealand.  Panasonic repeatedly solicited and interfered with these and other potential airline customers in order to cajole and induce them to use Panasonic's own software solutions.

44.     Among its many unlawful acts of interference, Panasonic has actively and repeatedly defamed and disparaged CoKinetic in the marketplace by, among other things, falsely informing airline customers, including Emirates and United Airlines, that CoKinetic's software was not compatible with and would not work on Panasonic hardware, and telling airlines that they should avoid doing business with CoKinetic because it was having financial issues, was going bankrupt, and would soon be out of business.  All of this was malicious and false.

45.     Panasonic even secretly eavesdropped on confidential CoKinetic business meetings as well as private discussions with Emirates employees while CoKinetic was working on Emirates' IFE system in Panasonic's Emirates lab—a facility with a private office that, as CoKinetic would later learn from a Panasonic whistleblower, had been secretly wired with a listening device to spy on CoKinetic.

46.     Panasonic's espionage was only one part of a concerted scheme to defame, disparage, and sabotage CoKinetic's product and cause Emirates to discontinue using CoKinetic's AirPlay software, even though Emirates, much like Virgin America, was winning industry awards with AirPlay for the best IFE system in the world.

47.     In fact, two senior Emirates employees would later disclose to CoKinetic at a meeting in Dubai that Panasonic had told Emirates that CoKinetic's AirPlay software was incompatible with Panasonic's new IFE hardware.   This was known by Panasonic to be categorically false and was in fact directly contrary to Panasonic's own contractual obligations pursuant to the Panasonic SLA.

48.     One of these Emirates employees also privately alleged to CoKinetic that Panasonic had directed its representatives in the Middle East to funnel illicit payments to Emirates engineers in Dubai in order to induce them to support discontinuing the use of CoKinetic's AirPlay software in favor of returning to Panasonic's IFE software. According to the Emirates employee, "money has already flowed to people in Emirates engineering."

49.     Panasonic also actively and unlawfully interfered with CoKinetic's other contractual relationships.  For example, beginning in 2008, CoKinetic and Panasonic began negotiations on the joint development of a comprehensive advertising and applications delivery platform for the in-flight industry (referred to generally as the "Marketplace").

50.     The Marketplace negotiation arose in the aftermath of Panasonic's continued anticompetitive wrongdoing, as well as its breaches of the Panasonic SLA and the Co-Marketing Agreement, and was intended to finally address CoKinetic's multiple notices of breach and remedy Panasonic's unwillingness to perform.

51.     Panasonic negotiated the Marketplace deal with CoKinetic for well over a year, repeatedly dragging out discussions unless CoKinetic threatened to walk away, until an agreement was fully drafted and finalized in July 2010, at which time Panasonic's management team represented to CoKinetic that the deal was approved pending "final approval" from Japan—which presumably meant getting approval for the transaction from Panasonic Corporation of North America and/or Panasonic Corporation.

52.     The unexecuted Marketplace contracts agreed to by the parties contemplated that Panasonic would make an eight-figure upfront license fee payment to CoKinetic in exchange for an exclusive and unlimited license to AirPlay.  As part of the agreement, CoKinetic was also to shift its IFE business from independent software services to a revenue-sharing model based on

the joint development of an "application store . . . to market, display, and distribute software applications to Customers . . . comprised of a . . . Panasonic-branded and controlled website to be developed by CoKinetic . . . that enables Customers to select those applications to be deployed to their IFE interactive platform through the App Store's content management and distribution architecture to be developed by CoKinetic."

53.     After several months of delay, in late October 2010, Panasonic finally advised CoKinetic, without explanation, that it was supposedly unable to obtain final approval from Japan to license AirPlay, as already fully negotiated and agreed to by the parties, and that Panasonic now wanted to start discussions all over again and begin negotiating a different deal for CoKinetic to build and operate some other form of an app store.

54.     At this point, CoKinetic realized that Panasonic never had any intention of entering into or performing any real agreement with CoKinetic.  Rather, Panasonic was negotiating the Marketplace in bad faith, as a subterfuge to distract CoKinetic and consume resources, all while Panasonic secretly worked to develop new IFE software, which Panasonic hoped would mirror AirPlay capabilities, while executing on its scheme to cause Emirates, United Airlines, and Air New Zealand to discontinue using AirPlay.

55.     As a result of Panasonic's decision to walk away from the Marketplace deal, CoKinetic was forced in late 2010 to launch its own AirPlay advertising and content management solution, called "OpenIFE."

56.     Shortly thereafter, CoKinetic began negotiations with Delta, which was interested at the time in developing a new model for IFE advertising and transactional opportunities, while also revamping its IFE platform.  Delta management made clear to CoKinetic that it was sick of

living with Panasonic's monopolistic control over IFE software services and preferred to begin working directly with CoKinetic.

57.    Accordingly, on May 16, 2011, CoKinetic and Delta entered into an OpenIFE Service Agreement (the "OpenIFE Agreement").   Pursuant to the OpenIFE Agreement, CoKinetic agreed to provide Delta with its OpenIFE service, and CoKinetic and Delta agreed to share certain advertising revenues generated through the OpenIFE service, which were forecast to exceed $170 million dollars through 2018.

58.    Just as Virgin America had done many years earlier, Delta advised Panasonic that it had entered into a contract with CoKinetic to roll out AirPlay across the Delta fleet and independently pursue advertising and transactional opportunities using OpenIFE, and warned Panasonic that Delta expected full cooperation.  In fact, Delta advised CoKinetic that its concern with getting Panasonic to cooperate caused Delta's Chief Operating Officer to send Panasonic a letter advising of the contract with CoKinetic and demanding that Panasonic provide its full cooperation, which, according to Delta, Panasonic responded to by providing assurances that it would fully cooperate.

59.    Not surprisingly, Panasonic did exactly the opposite, and instead repeatedly tortiously interfered with CoKinetic's contractual relationship with Delta, not only by defaming and disparaging CoKinetic, but also by actively sabotaging Delta hardware, blocking deployment of media and advertising, and deliberately and maliciously disrupting the performance of CoKinetic's AirPlay software.

60.    Among many other things, Panasonic tortiously interfered by once again deliberately making nearly constant secret changes to the Linux-Based Panasonic Core Software,

just as it had done with Emirates, thereby maliciously degrading and damaging the performance of Delta's IFE hardware in order to sabotage AirPlay.

61.     In addition, Panasonic once again used improper inducements, including on information and belief, expensive gifts, excursions, and entertainment, in order to influence Delta employees, interfere with Delta's relationship with CoKinetic, and induce Delta to breach its contract with CoKinetic.

62.     For example, CoKinetic witnessed Panasonic employee Mike Easterling openly discussing, before the start of a conference call, a large television that Panasonic had given as a "gift" to a Delta employee who later proved to be instrumental in Delta's decision to discontinue use of AirPlay. After an awkward silence and what appeared to be muting by some of the participants on the call, Mr. Easterling weakly offered that the television was actually given to the Delta employee by Panasonic in connection with some alleged charitable organization that the Delta employee was supposedly involved with.

63.     Panasonic's tortious interference induced Delta to repeatedly breach its contract with CoKinetic, including by failing to deploy AirPlay on Delta aircraft in accordance with its contractual obligations, failing to show advertising and apps on Delta aircraft using OpenIFE, and failing to secure cooperation with respect to Panasonic.  CoKinetic subsequently resolved its breach claim as to Delta pursuant to the terms of an amendment to the OpenIFE Agreement, dated July 1, 2014, which remains in effect.

64.     Thereafter, in or about late 2015 or early 2016, Delta began migrating the IFE systems on certain Delta aircraft from CoKinetic software to Panasonic software, which it continues to do. CoKinetic would ultimately learn from a Delta employee that Panasonic was secretly scheming to induce Delta to discontinue using AirPlay for years before the migration

began, and in fact had been secretly working on transition plans for Delta since sometime in 2013. Today, approximately 135 Delta aircraft continue to use CoKinetic's Airplay software, down from nearly 400 aircraft in 2016.

65.     Not surprisingly, in or about 2013, Panasonic reportedly received a subpoena pursuant to the FCPA asking its employees to preserve documents related to gifts and/or benefits.  More specifically, on information and belief, the subpoena sought communications between Panasonic and other entities related to payments to airline customers and government officials in Asia, Europe, and the Middle East.  Given Panasonic's recent public announcements, it appears that the FCPA subpoena in 2013 has since turned into a full-fledged criminal investigation.

66.     In sum, Panasonic has violated open source licensing requirements, breached contractual obligations, abused regulatory processes, engaged in corporate espionage, defamed CoKinetic and sabotaged its products, interfered with customer relationships, allegedly paid bribes, and otherwise employed unlawful means to monopolize the Panasonic IFE Software and Media Services Market.

67.     Accordingly, pursuant to Section 2 of the Sherman Act, 15 U.S.C. § 2, CoKinetic seeks injunctive relief in this action ordering an immediate end to Panasonic's attempted and actual, unlawful monopolization of the Panasonic IFE Software and Media Services Market.

68.     CoKinetic also seeks to recover compensatory damages, future damages, treble damages, and attorneys' fees caused by Panasonic's attempted and actual, unlawful monopolization of the Panasonic IFE Software and Media Services Market, all in an amount to be determined at trial but believed to be in excess of $100 million.

69.     Likewise, CoKinetic seeks injunctive relief, as well as restitution damages, pursuant to Section 17200 *et seq.* of the California Business and Professions Code, for Panasonic's unlawful and unfair competition.

70.     In addition, CoKinetic seeks to compel Panasonic to specifically perform its contractual obligation, pursuant to Version 2 of the GNU GPL, by publicly disclosing and distributing the source code to every version of the Linux-Based Panasonic Core Software.

71.      CoKinetic also seeks to recover compensatory damages for Panasonic's pervasive and ongoing material breaches of Version 2 of the GNU GPL, all in an amount to be determined at trial but believed to be in excess of $100 million.

72.     CoKinetic also seeks to compel Panasonic to specifically perform its contractual obligations, including its obligation to use "best efforts" to cooperate and sell CoKinetic's IFE software to Panasonic's airline customers, pursuant to the Co-Marketing Agreement.

73.     CoKinetic also seeks to compel Panasonic to specifically perform its contractual obligation to provide CoKinetic with all hardware, technical materials, documentation, and support necessary for CoKinetic to create compatible versions of its IFE software for all current and future versions of Panasonic IFE hardware systems, pursuant to the Panasonic SLA.

74.     CoKinetic also seeks to compel Panasonic to specifically perform its contractual obligation not to disparage CoKinetic or engage in anticompetitive conduct pursuant to the September 7, 2007 letter agreement.

75.     CoKinetic also seeks to recover compensatory damages caused by Panasonic's ongoing material breaches of the Co-Marketing Agreement and Panasonic SLA, all in an amount to be determined at trial but believed to be in excess of $100 million.

76.     CoKinetic also seeks to recover compensatory damages caused by Panasonic's material breach of its obligation not to disparage CoKinetic or engage in anticompetitive conduct pursuant to the September 7, 2007 letter agreement, all in an amount to be determined at trial but believed to be in excess of $100 million.

77.     Finally, CoKinetic seeks to recover compensatory damages caused by Panasonic's deliberate and tortious interference with CoKinetic's existing and prospective contractual relationships with Delta, United Airlines, Air Canada, and Air New Zealand, and compensatory and punitive damages for Panasonic's defamatory statements made to United Airlines, all in an amount to be determined at trial but believed to be in excess of $100 million.

## THE PARTIES

78.     Panasonic Avionics Corporation is a Delaware corporation doing business in the State of New York, with its principal place of business located in Lake Forest, California. Among other things, Panasonic sells IFE hardware systems as well as software and media services to commercial airline customers around the world.

79.     Panasonic Avionics Corporation is a subsidiary of Panasonic Corporation of North America, which is a Delaware corporation with its principal place of business located in Newark, New Jersey.  Panasonic Corporation of North America is the principal North American subsidiary of Panasonic Corporation, which is a Japanese corporation with its principal place of business located in Japan.

80.     CoKinetic Systems, Corp. is a Delaware corporation doing business in the State of New York, with its principal place of business located in Harrison, New York.  Among other things, CoKinetic provides IFE software and media services to commercial airline customers around the world.

18

## JURISDICTION AND VENUE

81.     CoKinetic brings this action under Section 4 of the Clayton Act (15 U.S.C. § 15) as a result of Panasonic's violations of Section 2 of the Sherman Act (15 U.S.C. § 2) and under New York and California law.

82.     This Court has subject-matter jurisdiction over CoKinetic's federal claims pursuant to 28 U.S.C. §§ 1331, 1337.

83.     The facts underlying the claims for relief under New York State common law and California Bus. & Prof. Code §§ 17200 *et seq*. share a common nucleus with the federal antitrust claims, and this Court has supplemental and pendent jurisdiction over such claims pursuant to 28 U.S.C. § 1367.

84.     This Court has personal jurisdiction over Panasonic because of its continuous and systematic contacts with this jurisdiction, including but not limited to its operations in New York, New York.

85.     Additionally, this Court has personal jurisdiction over Panasonic because the contracts signed by CoKinetic and Panasonic, which form part of the claims for relief in this action, expressly provide that "both parties hereby expressly agree to the exclusive jurisdiction of the courts of the State of New York."

86.     Venue is proper under 15 U.S.C. § 15 and under 28 U.S.C. § 1391 because Panasonic resides and transacts business within this District by, *inter alia*, contracting with airlines located in and outside the State of New York to provide hardware and IFE software services.

## THE RELEVANT PRODUCT MARKET

87.     The relevant product market at issue in this dispute is the Panasonic IFE Software and Media Services Market, which encompasses the development, testing, deployment, updating, and support for the graphical user interface ("GUI") and individual software applications that an airline passenger interacts with (collectively, the "Passenger GUI") on a Panasonic IFE hardware system to access customized amenities offered by an individual airline—including, for example, the options to view flight and destination information, select and watch television or a movie, listen to a library of music, play a computer game, order a snack or beverage, use a credit card to purchase an item for in-trip or post-trip fulfillment, complete a passenger survey, or view a product advertisement.

88.     The Panasonic IFE Software and Media Services Market also includes the development, testing, integrating, packaging, deployment, and updating of multimedia content displayed on a Panasonic IFE hardware system, including the process of adding and removing movies, music, games, and advertisements from a particular system onboard a particular aircraft, as well as the collecting and processing of credit card payment information and other airline-collected data.

89.     The relevant geographic market for the Panasonic IFE Software and Media Services Market is worldwide. On information and belief, Panasonic possesses over 95% market share in the Panasonic IFE Software and Media Services Market.

90.     Substantial barriers to entry exist in the Panasonic IFE Software and Media Services Market, including:

20

      a.      Panasonic's anticompetitive actions aimed at eliminating competition, including the credible threat that Panasonic will continue to engage in such actions to stifle or destroy future competition;

      b.      Panasonic's refusal to publicly disclose source code covered by the GNU GPL, which is required in order to create software for use in the Panasonic IFE Software and Media Services Market—*i.e.*, software that is compatible with Panasonic IFE hardware systems; and

      c.      The complex and costly regulatory requirements set by the FAA, which are required to meet safety standards for commercial aircraft, and which are manipulated by Panasonic for its benefit.

91.      Buyers within the Panasonic IFE Software and Media Services Market have no meaningful option to purchase software and media services from Panasonic competitors because Panasonic is unlawfully maintaining monopoly control over the Panasonic IFE Software and Media Services Market.

92.      Likewise, airline customers that purchase Panasonic's IFE hardware are locked-in to the system, including Panasonic's IFE software and media services, because of the significant time, commitment, and costs associated with switching to an alternate supplier of IFE systems, including IFE software and media services, which can typically cost hundreds of millions of dollars or more, and take several years of complex, unpredictable logistics and operational impacts, for any one fleet to accomplish.

## DETAILED FACTUAL BACKGROUND

### A.      The Market for IFE Hardware Systems

93.      Panasonic has long held monopoly power in the global market for IFE hardware systems, which are generally comprised of commercially available hardware components—such as computer hard drives, overhead and seatback display monitors, routers, and servers—all networked together on an aircraft and used by commercial airlines around the world in order to offer passengers customized in-flight amenities, including access to movies, television, music, flight and destination information, communication and productivity tools, food and beverage ordering, shopping, and other multimedia content.

94.      Panasonic advertises that it has installed over 5,000 of its IFE hardware systems on passenger airlines around the world, with hundreds of new installations scheduled in the months and years ahead.

95.      Panasonic sells its IFE hardware systems to nearly every major airline carrier in the world, including Delta, United Airlines, American Airlines, Inc. ("American Airlines"), Virgin America, Virgin Atlantic Airways Limited ("Virgin Atlantic"), Emirates, Singapore Airlines Limited ("Singapore Airlines"), Swiss International Air Lines AG ("Swiss Air"), Deutsche Lufthansa AG ("Lufthansa"), and Turkish Airlines, among many others.

96.      Global sales of IFE hardware systems exceeded approximately $3 billion in 2015, and are forecasted to reach nearly $10 billion by 2024.  Sales of IFE hardware systems in North America alone reportedly reached more than $1 billion in 2016.

97.      On information and belief, Panasonic's share of the global IFE hardware systems market is approximately 70%, giving it the ability to utilize and leverage its monopoly power in ancillary markets, including the Panasonic IFE Software and Media Services Market.

B.    **The Linux-Based Panasonic Core Software**

98.    Panasonic has released several generations of its IFE hardware systems over the years, gradually refining system architecture in order to reduce weight and improve technical features of the hardware, including processing speeds, memory and storage, graphical capabilities, and connectivity.

99.    While designs have evolved over time, all of Panasonic's IFE hardware systems utilize a Linux operating system in order to control communication with and access to the core features and capabilities of Panasonic's IFE hardware.

100.    As described by Linux.com, "the operating system manages the communication between your software and your hardware. Without the operating system . . . the software wouldn't function."

101.    Like other operating systems, such as Windows or Mac OS, a Linux operating system is the software that manages computer hardware and software resources and provides common services for computer programs.

102.    Critically, however, the source code to the Linux operating system (the "Linux Source Code") is "open source," and use of the Linux Source Code is strictly governed by Version 2 of the GNU GPL.

103.    Version 2 of the GPL is a valid and binding contract between the licensors (*i.e.*, the hundreds or even thousands of copyright owners that have freely contributed their works to the development of the Linux Source Code) and the licensee who uses those works (*i.e.*, Panasonic) made for the benefit of the general public.

104.    Version 2 of the GPL requires that the Linux Source Code, together with any modifications and derivative works thereto, be made available publicly and free of charge as a condition precedent to use.

105.    Specifically, Version 2 of the GPL provides that a licensee "may modify [its] copy or copies of the [Linux Source Code] or any portion of it, thus forming a work based on the [Linux Source Code], and copy and distribute such modifications or work under the terms of Section 1 above, provided [the licensee shall] . . . cause any work that [it] distribute[s] or publish[es], that in whole or in part contains or is derived from the [Linux Source Code] or any part thereof, to be licensed as a whole at no charge to all third parties under the terms of this License."

106.    Version 2 of the GPL also makes clear that its "requirements apply to the modified work as a whole."  Thus, while separate, independent, non-derivative works may not be governed by the terms and conditions of the GPL when they are distributed as truly separate works, "when you distribute the same sections as part of a whole which is a work based on the [Linux Source Code], the distribution of the whole must be on the terms of this License, whose permissions for other licensees extend to the entire whole, and thus to each and every part regardless of who wrote it."

107.    Accordingly, as a party to Version 2 of the GPL, Panasonic is required to publicly distribute the source code to its Linux-Based Panasonic Core Software to third parties free of charge.  Failure to do so automatically voids Panasonic's license to use the Linux-Based Panasonic Core Software pursuant to Version 2 of the GPL.

108.    The use of the Linux-Based Panasonic Core Software in the absence of a license constitutes infringement of copyrights belonging to hundreds or even thousands of software developers who have freely contributed to Linux.

109.    Panasonic does not publicly distribute the source code to its Linux-Based Panasonic Core Software as is expressly required by Version 2 of the GPL.  In fact, Panasonic deliberately refuses to disclose to third parties, including CoKinetic, the source code to its Linux-Based Panasonic Core Software, and instead willfully violates copyright law in order to unlawfully keep Panasonic IFE hardware closed to competition for third-party interactive software development and media services.

**C.     The Panasonic IFE Software and Media Services Market**

110.    In addition to selling IFE hardware systems, Panasonic also sells to airline customers a collection of interactive software development and media services to be used in connection with Panasonic's IFE hardware systems.

111.    Panasonic's interactive software development and media services, referred to herein as the Panasonic IFE Software and Media Services Market, encompasses the customized programming, testing, integrating, deployment, and updating of individual software applications running on an IFE hardware system, as well as the menus, screens, features, and capabilities of the graphical user interface that a passenger interacts with when using the Passenger GUI to access flight information, watch a movie, listen to music, play a game, order a snack, use a credit card to pay for a purchase, complete a passenger survey, or view an advertisement.

112.    The Panasonic IFE Software and Media Services Market also includes the development, testing, integrating, deployment, and updating of customized multimedia content displayed on a particular airline's IFE hardware system, including the process of adding and

removing movies, music, games, and advertisements from a particular system, as well as the processes involved with the handling of credit card payment processing data and other airline-collected data.

113.    Interactive software development and media services in the Panasonic IFE Software and Media Services Market are sold separately from the Panasonic IFE hardware system itself.   This is true both at the initial point of sale, when an airline first purchases and installs a Panasonic IFE hardware system on one of its aircraft, and it remains true over the life of the hardware, as airlines have a continuing need for software programming, testing, integrating, deployment, support, and updating of their IFE applications and the Passenger GUI, and an ongoing need for management and updating of multimedia content, such as movies, music, and advertising, made available on their systems.

114.    Thus, an airline may purchase interactive software development and media services from Panasonic when it first purchases a Panasonic IFE hardware system, and it may contract for these services in the future, long after the Panasonic IFE hardware system has been installed and operating on the airline's aircraft.

115.    An airline also remains free, in theory, to purchase interactive software development and media services from a third-party software service provider other than Panasonic.

116.    In order for this to occur, however, Panasonic must provide access to the Linux-Based Panasonic Core Software, so that competing software service providers can communicate with the basic features of the Panasonic IFE hardware system as necessary to develop, test, deploy, and update the Passenger GUI, as well as the particular applications and multimedia content being displayed on a particular airline's Panasonic IFE hardware system.

### D.  The Panasonic IFE Software and Media Services Lifecycle

117.    There are several phases involved in the development, testing, deployment, and updating of IFE software running on Panasonic IFE hardware systems.

#### 1.  The IFE Customer Requirement Phase

118.    The first phase of the IFE lifecycle involves the identification of customer requirements—*i.e.*, the features and capabilities the airline requires for its IFE software. Customer requirements typically include the interface design, referred to as the Passenger GUI design, as well as specific requirements for special features, such as flight and destination information, customized passenger surveys, food and beverage ordering, onboard and post-flight shopping, communications and Internet connectivity, and any other custom productivity and entertainment applications, as well as media content, such as movies, television, games, and advertising.

119.    With respect to Passenger GUI design, airlines have a number of options, but generally, an airline will require that the look and feel of the Passenger GUI matches and extends the airline's overall branding and marketing strategies—which will typically change multiple times during the life of an IFE hardware system.

120.    Next are the media requirements for an airline's IFE system. Media (*e.g.*, movies, television, music, etc.) is at the heart of an IFE system.  In fact, the primary purpose of an IFE system is to enable users (*i.e.*, passengers) to access media content.

121.    The Content Service Provider ("CSP") acts as a subscription manager or content aggregator on the airline's behalf and actually acquires (*i.e.*, licenses) the particular media that is then provided to the passengers on the aircraft.  The CSP is contracted by the airline and works

27

together with the airline to jointly determine what media types will be offered to passengers through the IFE system.

122.    The CSP will work with the IFE hardware and the IFE software services provider to establish the volume of media that the IFE system will support, as well as how certain types of media will be presented in the IFE system. The IFE software services provider will work with the CSP and airline to determine, as part of the Passenger GUI requirements, what metadata will be displayed for each type of media, and how much space (*i.e.*, character counts and poster image dimensions) each element will be allotted.

123.    Additionally, several documents will contain the requirements for the IFE system, including a Customer Requirements Document ("CRD"), a GUI Requirements Document ("GRD"), a Media Database Specification ("MDS") document, an Acceptance Test Procedure ("ATP") document, and the Interactive Acceptance Test Procedure ("IATP") document.

## 2.    **The Development Phase**

124.    The next step in the IFE lifecycle is the development phase. In the case of Panasonic IFE hardware systems, the Linux-Based Panasonic Core Software is in a non-stop development cycle. New versions of the Linux-Based Panasonic Core Software are constantly released, often resulting in the introduction of defects that affect the performance of the entire IFE system.

125.    Instead of providing source code to Linux-Based Panasonic Core Software, as it is obligated to do, Panasonic creates a set of APIs, which are supposed to allow third party IFE software like AirPlay to interact with the Linux-Based Panasonic Core Software and communicate with and execute the basic features of Panasonic's hardware—for example, starting a video and playing the correct language sound track, or accessing the information provided by

the flight management computer so that the time to destination can be displayed in the Passenger GUI. Other APIs are supposed to allow communication with other functions controlled by the IFE system, such as turning on the overhead reading light through a button on the Passenger GUI.

126.     Not surprisingly, changes in the Linux-Based Panasonic Core Software will frequently "break" existing APIs previously distributed by Panasonic, resulting in the need for changes to be made by Panasonic to the APIs as well.

127.     In the case of Panasonic, during the development phase, Panasonic also creates and maintains the media database for each airline customer. The media database will have a certain level of customization for each airline, and this customization has to be accomplished after the requirements are established.

3.     <u>**The Integration Phase**</u>

128.     The next phase in the IFE lifecycle is integration. In the case of Panasonic, integration is largely done on a "rack" environment in a Panasonic lab in Lake Forest, California. Panasonic racks are designed to reasonably emulate a specific aircraft type, as described in detail below. A separate rack representing each aircraft type will be set up for integration and testing purposes.

129.     The purpose of the rack is to emulate the hardware environment aboard the airline customer's aircraft. Accordingly, there will be a head-end server, comprised of the same hardware that will be, or is, installed on the aircraft, as well as a number of monitors and other hardware representative of those that will be installed on the aircraft. The goal is to replicate the aircraft environment, so that all of the required features and functions can be tested in the lab, prior to deployment to an aircraft.

130.    An aircraft type is very specific.  An aircraft type configuration includes large-scale specifications (*e.g.*, a 757 with a specific model of General Electric Corporation engines) as well as smaller specifications (*e.g.*, 257 seats that are a specific model from a specific manufacturer), and even much smaller specifications (*e.g.*, the type of IFE hardware).  To make any change to any component that is a part of the aircraft is to change its "type."  Each of these sub-types has its own Supplemental Type Certificate ("STC"), which is described further below.

131.    Prior to the formal ATP, all of the software that is to be released is collected by Panasonic and packaged into a "kit."  The software kit includes all of the software and configuration items that are to be released for installation.  For new hardware deployments, a new STC must be issued reflecting the modifications that will be made to the aircraft.

### 4.    The Testing Phase

132.    The next phase in the IFE lifecycle is ATP testing.  ATP testing is a formal test procedure conducted at the Panasonic rack and designed to ensure that the IFE system meets the documented requirements.

133.    As part of ATP, all of the software is "wiped" from the rack.  If the IFE program is part of a software upgrade, all of the software that is currently installed on the IFE system on the aircraft is installed on the rack.  If the IFE is part of a new installation, either on a new aircraft or as part of new hardware being installed on an existing aircraft, all of the software is removed from the rack and the hardware is configured to reflect the factory configuration.

134.    Once the customer rack has been properly configured, the dedicated Software Quality Assurance ("SQA") team at Panasonic conducts the ATP and IATP.  Each individual step is executed on the rack as documented and the results checked against the ATP and IATP documents.

### 5.      The Deployment Phase

135.    The next phase in the IFE lifecycle is actual deployment of the IFE system.  After a successful testing phase, the software kit is released for distribution to the target aircraft.  The IFE software as a whole is validated on the aircraft once the installation is completed.

136.    If the software installation is part of a new aircraft delivery, or part of a new hardware installation on an existing aircraft, the software installation is conducted as part of the hardware installation.  No additional changes to any components are allowed while the aircraft is at the facility conducting the installation.  If new media is required before the aircraft enters passenger service, the media will be updated after the aircraft leaves the modification/manufacturer facility.

137.    In the case of Panasonic, whether the new IFE software is part of a new aircraft delivery, a retrofit of new hardware into an existing aircraft, or just part of a new software deployment into existing hardware, the software and media deployment is conducted by Panasonic personnel.

### 6.      The Support Phase

138.    After deployment, the next phase in the IFE lifecycle is post-deployment support. Once the IFE software has been installed onto an aircraft, how it is supported depends primarily upon the nature of the relationships of the parties involved.

139.    The regular updating of the media onboard an aircraft is generally the largest piece of post-deployment support required for an IFE system.  In the case of Panasonic, the CSP acquires media and updates Panasonic's Media Management Application ("MMA") with the upcoming media metadata on an on-going basis.

140.     The CSP also provides the actual media files to Panasonic for its client airlines on a regular, generally monthly, basis.   Each month, Panasonic personnel manually deploy the updated media to the airline's IFE-equipped aircraft and Panasonic charges its airline customers for these monthly media support services.

141.     An IFE system can generate a variety of data that needs to be offloaded from the aircraft.  This can be time-sensitive and confidential data, such as purchase transactions, or less sensitive data, such as survey responses or usage information for the IFE system or for advertising within the IFE system.

142.     The data may be offloaded through several channels.  Aircraft equipped with cellular modems are able to connect automatically to servers on the ground when the aircraft is parked at the gate, allowing data to be offloaded without manual intervention.  For aircraft with no cellular modem aboard, or when connection from the cellular modem is not made available, data must be offloaded manually, such as by connecting a portable cellular modem or by offloading the data onto a USB thumb drive.

143.     When there is a direct relationship between CoKinetic and the airline, the airline can consume, or use, the data that is offloaded from the IFE system through CoKinetic's reporting portal.  Comprehensive reporting on advertising metrics, media usage, and reporting on what parts of the IFE system passengers use most are made available to the airline, and transactional data is sent directly to the credit card processors on behalf of the airline in encrypted form.

144.     The process by which an airline requests and executes changes to its IFE system, including, for example changes to its GUI, also varies considerably depending upon whether the

32

airline has a direct relationship with CoKinetic, or CoKinetic is acting as a subcontractor to Panasonic.

145.    Panasonic breaks down the items that get deployed to aircraft into two main categories.  These categories are "software" and "content."  Software is generally defined as compiled code.  In Panasonic's IFE systems, content generally means media that includes movies, music, and images such as movie posters and advertisements.

146.    The CoKinetic IFE Airplay software platform is made up of both software and "Variable Content," which in CoKinetic's IFE system may include navigational features like screens, ads, images, and media.  Variable Content enables CoKinetic to make significant changes to the look, feel, and behavior of Passenger GUI by updating Variable Content, rather than engaging in updates to software.

147.    When CoKinetic has a direct relationship with the airline, the airline requests a change directly with CoKinetic.  CoKinetic will evaluate the requested change and collaborate with the airline on how to execute the desired change.  If the change can be accomplished via an update to the Variable Content, a plan is created to make the change and deploy it to the aircraft.

148.    Updates to the Variable Content may be deployed via cellular modem, portable modem device, or USB thumb drive, depending upon the change, the aircraft configuration, and other considerations.  A change to the Variable Content can generally be made and deployed by an airline in a matter of days or weeks, bypassing most of Panasonic's expensive and time consuming monopolistic processes and procedures.

149.    Notwithstanding the fact that Panasonic tests the delivery and deployment of Variable Content during ATP testing, it nonetheless seeks to block CoKinetic's use of Variable

Content for IFE system updating by refusing to update applicable STCs, and by blocking the use of modems and other anticompetitive means.

150.    When an airline requests a change from Panasonic, a long and expensive process for the airline is initiated.   The first step is the Change Request ("CR").   A formal CR is submitted to Panasonic by the airline.   The CR is essentially the requirements document used to make a change to the IFE system.   In this scenario, a new version of the IFE software is developed, integration is done at the rack, a new software kit is created, and a round of ATPs is conducted.   The time required for this can be months and sometimes even years, and the expense for the airline is significant, due largely to the charges Panasonic imposes for development and rack resources.

### E.    The Panasonic IFE Software and Media Services Market Monopoly

151.    Utilizing an array of anticompetitive conduct and wrongful means, Panasonic has been able to accomplish and maintain a monopoly over the Panasonic IFE Software and Media Services Market, including by illegally tying software services to IFE hardware, abusing FAA regulatory processes, refusing to deal with competitors and otherwise engaging in anticompetitive, tortious and wrongful conduct.

### 1.    Product Tying

152.    First, Panasonic has unlawfully tied its IFE software to its hardware, including on information and belief, in transactions with Virgin America, Air Canada, United Airlines and other airlines, by requiring or otherwise improperly inducing airlines to purchase Panasonic's IFE software tied together with its IFE hardware systems.

153.    In fact, Panasonic has specifically refused requests from airline customers to use CoKinetic's AirPlay software in conjunction with the purchase of new IFE hardware from

34

Panasonic.  For example, in February 2015, IFE manager of Air Canada, Eric Lauzon advised CoKinetic that despite asking to use AirPlay, Air Canada was told by Panasonic that "the choice of software was not ours to make—we don't have a choice."

154.    Likewise, Panasonic refused to allow United Airlines to use CoKinetic's AirPlay software on new IFE hardware purchases in or about late 2015.  Instead, Panasonic required United Airlines to purchase Panasonic's IFE software tied together with its IFE hardware system, and on information and belief, Panasonic improperly induced the transaction with United Airlines by providing a significant cash rebate.

155.    The same is true with Virgin America.  On information and belief, Panasonic improperly induced Virgin America to drop AirPlay by providing a steep discount on new Panasonic IFE hardware, on the condition that Virgin America agree to drop CoKinetic's AirPlay software in favor of Panasonic's IFE software, which Panasonic falsely promised would deliver all of the features and functionalities that Virgin America's IFE system had using AirPlay.

### 2.    Abuse of FAA Regulatory Processes

156.    Second, Panasonic has unlawfully maintained its monopoly by abusing the STC regulatory process.  The STC is a type certificate ("TC") issued when an applicant receives approval from the FAA to modify the configuration of an aircraft, which includes IFE hardware systems and the IFE software that runs on them.

157.    On information and belief, Panasonic prepares and files the STC on behalf of its airline customers in order to dictate certain operational provisions in the STC that lock in Panasonic's monopoly over IFE software processes.

35

158. Unlike IFE hardware systems, which, among other things, involve the installation and physical wiring of hardware components on an aircraft, IFE software has been consistently represented by Panasonic to the FAA to be "Level E" software, which means that its failure would have no effect on flight safety or on pilot workload.

159. Despite the fact that IFE software is classified as Level E, Panasonic has deliberately created artificial processes in the STCs that it files on behalf of its airline customers concerning the deployment of IFE software, as well as the operational process for updates, media uploading and offloading, payment processing, and other software and media services on Panasonic IFE hardware, such that providing any of these services for the airline is deemed "Maintenance," which requires competing third-party software services providers to use FAA-licensed mechanics to perform.

160. Panasonic characterizes these software services as "Maintenance" despite the fact that they should and could readily be characterized as "Elemental" procedures, and despite the fact that Panasonic has itself previously agreed, upon airline demand, to categorize these procedures in STCs as "Elemental." The important difference in this categorization is that changes to Level E components deemed "Elemental" do not require an aircraft logbook entry, which can only be made by an FAA-licensed mechanic.

161. In other words, Panasonic is free to choose which designation is applied to these procedures but effectively escalates the criticality of Level E systems by designating basic IFE software processes as "Maintenance" rather than "Elemental," except, on information and belief, in those instances where an airline threatens not to purchase Panasonic's IFE hardware.

162. More to the point, Panasonic has exploited the STC process by creating artificial "Maintenance" procedures for IFE software services in order to erect a near-impossible barrier to

entry for third-party software service providers who do not sell IFE hardware (and thus do not have thousands of FAA-licensed mechanics) from offering airlines software services on Panasonic IFE hardware systems.

### 3.   Refusal to Deal

163.    Third, Panasonic has also succeeded in monopolizing the Panasonic IFE Software and Media Services Market by deliberately refusing to distribute the Linux-Based Panasonic Core Software, which controls access to the basic functions of Panasonic's IFE hardware, even though its own right to continue using and modifying the Linux operating system is unambiguously conditioned on free public distribution of the modified source code to third parties pursuant to Version 2 of the GPL.

164.    On information and belief, Panasonic even manipulates the automatic Linux warnings associated with any unlawful use of modified Linux Source Code and artificially turns off such warnings in order to hide its violations and deliberately avoid its obligation to publicly distribute the source code to the Linux-Based Panasonic Core Software.

165.    As a result, competing software service providers are unable to develop software that can fully communicate with the basic functionality of Panasonic hardware, thus preventing companies like CoKinetic from being able to compete fairly in the market and offer airlines truly independent software solutions.

166.    CoKinetic, as a member of the public, is an intended third-party beneficiary of the GPL.  Despite CoKinetic's requests, Panasonic refuses to turn over to CoKinetic (or otherwise publicize) the Linux-Based Panasonic Core Software.

167.    Panasonic also is able to use its control over source code to the Linux-Based Panasonic Core Software and its hardware APIs in order to make ongoing, undisclosed and often

malicious modifications to the source code, purposely "breaking" Panasonic's own APIs in order to sabotage the performance of competing third-party software that Panasonic deems a competitive threat—including, specifically, CoKinetic IFE software.

168.    More to the point, Panasonic engages in unlawful trade practices by deliberately degrading and damaging IFE hardware systems owned by Panasonic's airline customers, including Emirates, Delta, United Airlines and others, all to create the false and misleading appearance that only Panasonic is able to provide airlines with reliable software services on Panasonic IFE hardware.

169.    Given the significant technical and artificial regulatory barriers to entry into the Panasonic IFE Software and Media Services Market, and given its own wrongful actions in suppressing access to the Linux-Based Panasonic Core Software, Panasonic succeeded in unlawfully monopolizing the market and remained the sole competitor until CoKinetic entered the Panasonic IFE Software and Media Services Market in 2004.

**F.    CoKinetic Enters the Panasonic IFE Software and Media Services Market**

170.    CoKinetic was founded in 2001 to commercialize its proprietary, patented user interface technology.

171.    CoKinetic's patented technology is described as an Internet Interface and Integration Language ("I3ML") system and method.  The technology relates to a system and method for employing I3ML data in order to, among other things, enable a user having very little software programming knowledge to create GUIs.

172.    CoKinetic's patented user interface technology forms the foundation of all of CoKinetic's IFE solutions.  By 2004, CoKinetic had developed AirPlay, its IFE software platform. AirPlay is a high-performance software platform used to create IFE systems for airlines

based on CoKinetic's patented technology. In an IFE entertainment system, AirPlay's role is similar to that of a web browser.

173.    Just as web browsers take HTML text from the Internet and render it as a screen, AirPlay takes XML from onboard servers to render each screen of an interactive. CoKinetic's IFE software is primarily built using XML, and AirPlay is the engine that brings those products to life.   CoKinetic's approach provides considerable benefits in flexibility that can greatly improve the return on investment in IFE hardware systems.

174.    For example, it is not uncommon for changes to an airline's IFE software to require many months of advanced planning and considerable expenses charged by Panasonic, which treats almost every component of an IFE interactive developed on its IFE software platform as part of the "software," thus forcing airlines to go through the significant time and considerable expense of software development, integration, testing, deployment and burdensome and expensive operational procedures for updating and support.

175.    AirPlay IFE systems avoid most of this because many of the components of its GUI are content-based and not software, which means they can be dynamically updated almost instantly, without requiring any changes to software.   The freedom to make changes without the delays and costs of Panasonic's "change request" process is critical to innovation, passenger satisfaction and harmonizing IFE systems with an airline's broader branding initiatives, thus maximizing IFE-related ancillary revenue for airlines.

176.    AirPlay offers airlines this unparalleled flexibility and is compatible with and requires zero changes to the media, ads, maps, fulfillment, payment, certification and review, and other services provided by IFE hardware vendors.

177.    In or about early 2004, CoKinetic began working with Virgin America to install and run AirPlay on Virgin America's newly purchased aircraft.  At the time, Virgin America was in the early stages of preparing to launch its new service and enter the domestic airline market.

178.    As part of its core marketing strategy, Virgin America sought to distinguish itself from the competition by equipping its aircraft with the best IFE entertainment system in the domestic market.  Virgin America envisioned an innovative and constantly evolving IFE system, offering a host of features and capabilities, including food and beverage ordering, seat-to-seat chat, and numerous other entertainment and marketing functions, most of which did not exist on any other IFE system at the time.

179.    Eventually, Virgin America concluded that it could never accomplish its product vision using Panasonic or any other IFE hardware system manufacturer's software and content management services.  As a result, Virgin America decided to instead license AirPlay and hire CoKinetic to help develop what would become Virgin America's award winning "Red" IFE system.

180.    Accordingly, CoKinetic sent a team to Panasonic as well as to Thales Avionics, Inc. ("Thales"), which was the primary IFE hardware systems competitor to Panasonic at the time, in order to test and validate that CoKinetic's IFE software was capable of running on their IFE hardware systems, both of which were based on the Linux operating system, which is open source and was well known to CoKinetic.

181.    It took CoKinetic less than two days to have its AirPlay IFE software successfully running on Panasonic and Thales hardware systems and demonstrating several of the innovative features that Virgin America sought to include in its IFE system.

182.    After the tests, CoKinetic believed that Panasonic was the better of the two options for IFE hardware systems and advised Virgin America of this fact.  Virgin America then informed Panasonic and Thales that its decision to purchase either of their IFE hardware systems would be contingent on their agreement to allow Virgin America to use CoKinetic's IFE software and to cooperate with CoKinetic and provide access to APIs.

183.    Ultimately, Panasonic accepted the condition and won the bid for Virgin America's business.  Indeed, the relationship between Virgin America and CoKinetic was only possible because Virgin America required cooperation with CoKinetic, acting as Virgin America's designated IFE software services provider, as a condition to its agreement to purchase IFE hardware from Panasonic, thus requiring Panasonic to provide CoKinetic with the APIs necessary to integrate AirPlay with Panasonic's IFE hardware.

184.    CoKinetic's agreement with Virgin America was the first of its kind in the industry—an agreement in which an independent, software services provider contracted directly with an airline to develop their IFE software for use on a Panasonic IFE hardware system.

G.    **Panasonic Negotiates the Exclusive Right to Sell CoKinetic's IFE Software**

185.    In 2006, CoKinetic successfully launched its AirPlay IFE software platform with Virgin America on the Panasonic IFE hardware system, producing an avalanche of accolades and industry awards for Virgin America's "Red" IFE system, and showcasing to airlines around the world what could be accomplished when an airline chooses to disaggregate the purchase of IFE hardware systems from the purchase of IFE software services.

186.    Panasonic was quick to recognize the implications of CoKinetic's success with Virgin America and the long-term competitive threat that AirPlay software posed to Panasonic's

ability to maintain and continue its monopoly control over the Panasonic IFE Software and Media Services Market.

187.    Acting to preempt the emerging competitive threat from CoKinetic, Panasonic schemed to buy itself time by negotiating with CoKinetic for what was supposed to be an exclusive license to use AirPlay, along with Panasonic's contractual commitment to use its best efforts to cooperate and sell AirPlay to Panasonic's IFE hardware airline customers.

188.    On October 2, 2006, Panasonic and CoKinetic entered into a license agreement, the Panasonic SLA, pursuant to which Panasonic acquired the exclusive right to license and distribute AirPlay to its airline customers in conjunction with the sale of Panasonic IFE hardware systems. The exclusivity provision, which reflected the parties' intention that AirPlay would become the primary software solution on Panasonic's IFE hardware, was subject to Panasonic meeting certain implementation milestones and licensing minimums, starting with Panasonic's contractual obligation to designate three airline customers for initial acceptance testing of CoKinetic's IFE software.

189.    Pursuant to Section 4.2 of the Panasonic SLA, "[t]he Acceptance Testing will be conducted using three customers of Licensee, who shall be selected with CoKinetic's participation and approval based partly upon CoKinetic's ability to successfully complete the Acceptance Testing within twelve months following the execution and delivery of this Agreement."

190.    Section 2.1 of the Panasonic SLA provides that: "During the Term, CoKinetic hereby grants to Licensee a non-transferable . . ., exclusive . . ., world-wide, fee-bearing license under all applicable Intellectual Property rights to install, operate, use, reproduce, display,

distribute, and perform the Software in its in-flight entertainment hardware systems for use by passenger airline carriers and manufacturers."

191.    Section 6.7(ii) of the Panasonic SLA states that "[n]otwithstanding anything to the contrary set forth in this Agreement . . . if after executing this Agreement Licensee shall acquire a financial interest in, or enter into an exclusive or similar license arrangement with, any person or entity that competes with AirPlay within the IFE market, such that AirPlay will no longer be Panasonic's primary IFE runtime engine, the license granted hereunder shall immediately cease to be an exclusive license."

192.    Pursuant to Section 6.7(iii), "in the event that, commencing six months following the third successful customer Acceptance Test . . ., or on October 1, 2007, whichever shall first occur, the Licensee fails to pay CoKinetic at least $1,800,000 in license royalty fees during each successive 365 day period calculated from such date (of which at least $360,000 shall be paid in each 90 day period), the license granted hereunder shall cease to be an exclusive license with effect from the last day of (x) the 365 day period in respect of which Licensee fails to pay CoKinetic at least $1,800,000 in license royalty fees, or (y) the 90 day period in respect of which Licensee fails to pay CoKinetic at least $360,000 in license royalty fees, whichever shall first occur.  For the purposes hereof, payments in excess of $1,800,000 in each 365 day period shall be credited towards the immediately following 365 day period (but will not carry over beyond that period).  Such excess payments shall also be apportioned towards the 90 day minimum payment requirement as shall Licensee see fit."

193.    Additionally, Section 12.1 of the Panasonic SLA also explains that, "[n]otwithstanding the exclusive nature of the license granted to Licensee hereunder, in accordance with the terms and conditions of the separate [Co-Marketing Agreement] between the

parties . . . during the Term, both CoKinetic and Licensee shall have the right to sell AirPlay directly to existing customers of Licensee as of the date hereof, and Licensee shall receive 15 percent of the CoKinetic revenues derived from such sales as set forth on the [Co-Marketing Agreement].  Subject to the terms and conditions of the [Co-Marketing Agreement], CoKinetic and Licensee will cooperate to create a suitable marketing plan for these efforts, and will collaborate in seeking and securing such sales.  However, the parties acknowledge and agree that Licensee will focus its efforts on sales to new customers."

194.    Section 13.1 of the Panasonic SLA provides that Panasonic "will provide all necessary hardware, technical materials, application programming interfaces, required licenses, and other assistance that is necessary to permit CoKinetic to create [versions of AirPlay for each current and future Panasonic hardware platform]."

195.    On October 2, 2006, Panasonic and CoKinetic also entered into the Co-Marketing Agreement.  Among other things, Section 2.1 of the Co-Marketing Agreement provides that "CoKinetic and Panasonic will act in good faith and use their best efforts to collaborate to sell Airplay directly to Panasonic's Customers."

196.    The intended purpose of the Panasonic SLA and Co-Marketing Agreement was for Panasonic and CoKinetic to work together to develop and market CoKinetic's IFE software to existing and potential airline customers around the world as the primary IFE software running on Panasonic's IFE hardware systems.

197.    Pursuant to Section 6.1, the term of the Panasonic SLA continues until December 31, 2025, and pursuant to Section 1.7 of the Co-Marketing Agreement, the term "shall have the meaning set forth in the [Panasonic SLA]."

H.    **Panasonic's Breach of the GNU GPL**

198.    As outlined above, all of Panasonic's IFE hardware systems use the Linux-Based Panasonic Core Software, which is based on Linux Source Code, to control access to the core features and capabilities of Panasonic's IFE hardware.

199.    Critically, Linux Source Code is "open source."  Any use of the Linux Source Code is strictly governed by Version 2 of the GNU GPL, which is a valid and binding contract between the licensors (*i.e.*, the thousands of copyright owners that have freely contributed their works to the development of the Linux Source Code) and the licensee who uses those works (*i.e.*, Panasonic) made for the benefit of the public.

200.    Version 2 of the GNU GPL requires that the Linux Source Code, and any modifications and derivative works be made available publicly as a condition to use. Specifically, Version 2 of the GNU GPL provides that a licensee "may modify [its] copy or copies of the [Linux Source Code] or any portion of it, thus forming a work based on the [Linux Source Code], and copy and distribute such modifications or work under the terms of Section 1 above, provided [the licensee shall] . . . cause any work that [it] distribute[s] or publish[es], that in whole or in part contains or is derived from the [Linux Source Code] or any part thereof, to be licensed as a whole at no charge to all third parties under the terms of this License."

201.    Version 2 of the GNU GPL also makes clear that its "requirements apply to the modified work as a whole."  Thus, while original, non-derivative works, which can be reasonably considered independent and separate works in themselves, are not governed by the license when they are distributed as separate works, "when you distribute the same sections as part of a whole which is a work based on the [Linux Source Code], the distribution of the whole

must be on the terms of this License, whose permissions for other licensees extend to the entire whole, and thus to each and every part regardless of who wrote it."

202.    Accordingly, as a party to Version 2 of the GNU GPL, Panasonic is required to freely distribute the source code to its Linux-Based Panasonic Core Software to third parties free of charge.  Failure to do so automatically voids Panasonic's license to use the Linux-Based Panasonic Core Software pursuant to Version 2 of the GNU GPL.  The use of the Linux-Based Panasonic Core Software in the absence of a license constitutes thousands of individual acts of copyright infringement.

203.    Despite this requirement, Panasonic does not freely distribute the source code to its Linux-Based Panasonic Core Software as is expressly required by Version 2 of the GNU GPL. Instead, Panasonic chooses to willfully breach its obligation and violate copyright law in order to keep Panasonic IFE hardware systems closed to competition, thereby allowing Panasonic to monopolize the Panasonic IFE Software and Media Services Market.

204.    CoKinetic, as a third party beneficiary of the GPL, has repeatedly requested a copy of the source code to the Linux-Based Panasonic Core Software, including most recently requesting the source code on several occasions throughout the second half of 2016, however, Panasonic continues to refuse and otherwise fails to distribute the source code as is required.

### I.    **Panasonic's Breach of the Panasonic SLA**

205.    Almost immediately after executing the Panasonic SLA in October 2006, Panasonic began materially breaching its obligations by, among other things, failing for many months to pay CoKinetic as agreed in the Panasonic SLA, refusing to provide CoKinetic with all three airline customers for acceptance testing as expressly required by the Panasonic SLA, and by otherwise consistently and deliberately failing to cooperate with CoKinetic.

206. Specifically, Panasonic repeatedly breached its obligations under Section 13.1 of the Panasonic SLA, to "provide all necessary hardware, technical materials, application programming interfaces, required licenses, and other assistance that is necessary to permit CoKinetic to create [versions of AirPlay for each current and future Panasonic hardware platform]." Indeed, Panasonic breached this obligation with respect to each and every airline customer that CoKinetic ever interacted with, including those airline customers designated to use AirPlay pursuant to the Panasonic SLA.

207. Rather than cooperate as contractually required, Panasonic instead began deliberately making constant changes to the Linux-Based Panasonic Core Software, often purposely without notifying CoKinetic, which inevitably sabotaged the performance of CoKinetic's IFE software and severely damaged CoKinetic's relationship with airline customers, especially Emirates.

208. In fact, by August 17, 2007, less than one year after Panasonic and CoKinetic executed the Panasonic SLA, CoKinetic was forced to send notice of termination due to Panasonic's bad faith and failure to perform any of its obligations. In its termination notice, CoKinetic cited, among other things, Panasonic's "repeated acts of bad faith and anticompetitive actions towards CoKinetic in the marketplace over the past several months, including product disparagement, refusal to deal, tortious interference, and other wrongful acts."

209. After an exchange of several letters between CoKinetic and Panasonic, initiated by CoKinetic's August 17, 2007 letter, on September 6, 2007, CoKinetic sent a letter to Panasonic requesting that Panasonic agree to specific obligations set forth in the letter, including that "[Panasonic] agrees to provide CoKinetic with access to all necessary development hardware and API data for the System 3000 platform and [Panasonic's] current handheld

platform, no later than September 7, 2007," and that "[Panasonic] agrees to halt any product disparagement or any other anticompetitive conduct and promises to honor its obligation to act in good faith and cooperate with CoKinetic in the sale of AirPlay directly to [Panasonic's] customers." In return, "if [Panasonic] agrees to each of these items, CoKinetic will, without waiver, rescind its August 17, 2007 termination notice."

210. Immediately thereafter, on September 7, 2007, Panasonic wrote to CoKinetic advising that Panasonic "agrees, and specifically confirms its agreement, with each of the requests set out in [CoKinetic's] September 6, 2007 letter." Indeed, Panasonic specifically agreed "that it will not engage in any such disparagement or anticompetitive conduct in the future."

211. Accordingly, in return for Panasonic's agreement to, among other things, "not engage in any such disparagement or anticompetitive conduct in the future," CoKinetic revoked its August 17, 2007 termination as agreed.

212. Despite Panasonic's agreement in its September 7, 2007 letter to perform its obligations under the Panasonic SLA, and its agreement "not to engage in any such disparagement or anticompetitive conduct in the future," Panasonic has and continues to breach its obligations pursuant to the Panasonic SLA, and it continues to breach the September 7, 2007 letter agreement to the present day.

213. Indeed, CoKinetic has made repeated requests for APIs and access to the source code for each version of the Linux-Based Panasonic Core Software running on Panasonic's eFx, X2, Eco, and eX1 platforms, as well as the crew panels in service on each of these platforms—all of which are necessary for CoKinetic to create compatible versions of AirPlay as expressly provided for pursuant to the Panasonic SLA.

214.    Despite its obligations under Section 13.1 of the Panasonic SLA, Panasonic refuses to cooperate and provide CoKinetic with the APIs and source code for the Linux-Based Panasonic Core Software.

215.    Accordingly, on January 16, 2017, CoKinetic wrote to Panasonic concerning its repeated notices of breach of the Panasonic SLA, and once again advised Panasonic that "[i]n the event Panasonic does not cure its breach within 30 days of the date of this letter, CoKinetic will have no choice but to continue performing the [Panasonic SLA] while immediately commencing legal action to compel specific performance of Panasonic's obligations therein, and to recover all of CoKinetic's damages arising from Panasonic's breaches."

216.    As of this date, Panasonic has still not provided CoKinetic with the requested APIs and access to the source code for each and every version of the Linux-Based Panasonic Core Software running on all of Panasonic's eFx, X2, Eco, and eX1 platforms, as well as the crew panels in service on each of these platforms.

217.    Accordingly, CoKinetic seeks to compel Panasonic in this action to specifically perform its obligations under the Panasonic SLA, including pursuant to Section 13.1, and CoKinetic also seeks to recover damages in an amount to be determined at trial as a result of Panasonic's material breaches.

**J.    Panasonic's Breach of the Co-Marketing Agreement**

218.    Likewise, almost immediately after executing the Co-Marketing Agreement in October 2006, Panasonic began materially and deliberately breaching its contractual obligations to CoKinetic.

219.    First, Panasonic breached Section 2.1 of the Co-Marketing Agreement by failing to act in good faith and use best efforts to collaborate with CoKinetic to sell AirPlay, and to

ensure that CoKinetic retained the airline customers initially designated to CoKinetic pursuant to the Panasonic SLA—Emirates, United Airlines, and Air New Zealand.

220.    Rather, after each of the three initial airline customers began using CoKinetic's AirPlay software, Panasonic devoted its best efforts to actively sabotaging CoKinetic's relationship with all of them, and actively sought to convince them to drop AirPlay in favor of Panasonic's IFE software.

221.    For example, from the outset of CoKinetic's relationship with Emirates, which was the first airline designated to CoKinetic pursuant to the Panasonic SLA, Panasonic's senior manager in charge of the Emirates project, Brinder Bhatia, repeatedly instructed Panasonic staff members to interfere with CoKinetic's efforts to deliver Emirates software.

222.    CoKinetic only learned of these clandestine sabotaging activities because Panasonic project manager Jeffrey Wert, disclosed to CoKinetic that malicious efforts to purposely sabotage the Emirates IFE program were being made.

223.    On several occasions, Mr. Wert informed CoKinetic of Mr. Bhatia's determination to "get rid of" CoKinetic by any means necessary, characterizing CoKinetic's participation on the Emirates project as "Panasonic funding its own competition."

224.    According to Mr. Wert, Mr. Bhatia routinely held strategy meetings dedicated to finding ways of "getting rid of" CoKinetic, including by interfering with CoKinetic's development of the Emirates software, inciting resentment of CoKinetic with customers, and thwarting any plans that would "make CoKinetic more successful."  Mr. Bhatia directly instructed Panasonic staff that such actions would result in replacing CoKinetic with an internal Panasonic team and would fund the salaries of that team.

225.    Mr. Bhatia has apparently directed acts of sabotage in connection with the Emirates program in the past.  Indeed, Mr. Bhatia himself boasted in the presence of a CoKinetic employee that a third party in Dubai, which, on information and belief, had been retained by Emirates to replace Panasonic and provide media preparation services for the IFE program, needed Panasonic's cooperation in providing its media encoding specifications.

226.    Mr. Bhatia boasted at the time that Panasonic did not want the third party to be capable of encoding the media correctly.  Acting on then Chief Executive Officer, Paul Margis' instruction to "hand over" the specifications, Mr. Bhatia proudly explained that he ensured the specifications provided to the third party in Dubai included incorrect and incomplete information.  On information and belief, the third party in Dubai was unable to correctly encode media for approximately six months or more.

227.    Mr. Wert also advised CoKinetic that a Panasonic employee, Chuck Sharf, secretly eavesdropped on confidential internal CoKinetic business meetings as well as private discussions with Emirates employees, while CoKinetic was working on Emirates' IFE system in Panasonic's Emirates lab—a facility with a private office that had been secretly wired with a laptop listening device in order to spy on CoKinetic.

228.    Mr. Wert advised CoKinetic that he was disgusted by the duplicity and unfair and deceptive dealing of Panasonic staff, which he believed was completely contrary to his own responsibilities for successfully delivering the Emirates system.

229.    On information and belief, Panasonic ultimately fired Mr. Wert for whistleblowing activities, which resulted in a confidential settlement of a wrongful termination dispute between them.

230.    Panasonic's sabotage and espionage in connection with Emirates was just the start of its concerted scheme to block AirPlay and destroy CoKinetic's relationship with airline customers, despite the fact that Emirates, just like Virgin America, was winning industry awards with AirPlay for the best IFE system in the world.

231.    To illustrate, on information and belief, Panasonic actively lobbied in several meetings with Emirates to convince them to drop AirPlay in favor of Panasonic's new IFE software.  Indeed, CoKinetic later learned that Panasonic told Emirates that it was not offering CoKinetic's AirPlay software because it was not compatible with Panasonic's new hardware— an allegation that Panasonic knew to be completely false, entirely at odds with Panasonic's contractual obligation to cooperate with CoKinetic pursuant to the Panasonic SLA, and a blatant breach of the Co-Marketing Agreement.

232.    Specifically, two senior Emirates employees would later disclose to CoKinetic at a meeting in Dubai that Panasonic had deliberately lied to Emirates by falsely claiming that CoKinetic's AirPlay software would not be compatible with Panasonic's new IFE hardware.

233.    One of these employees also privately alleged to CoKinetic that Panasonic had secretly funneled illicit payments to Emirates engineers in order to induce them into agreeing to support discontinuing the use of CoKinetic's AirPlay software in favor of returning to Panasonic's own IFE software.  According to this Emirates employee, "money had already flowed to people in Emirates engineering."

234.    Similarly, in a meeting in New Zealand, concurrently with the efforts by Mr. Bhatia to interfere with the Emirates project, Air New Zealand staff members Mathew Wood and Sally Lythgo disclosed to CoKinetic that Panasonic's then Chief Executive Officer Paul Margis had expressly warned them to "avoid CoKinetic."

235.    Likewise, Panasonic falsely and maliciously advised United Airlines that CoKinetic was in financial trouble and going out of business.  Panasonic eventually refused to allow United Airlines to use CoKinetic's AirPlay software on new IFE hardware purchases, instead requiring United Airlines to purchase Panasonic's own IFE software tied together with its IFE hardware system.

236.    Panasonic ultimately solicited and interfered with these and countless other potential airline customers in order to cajole and induce them by whatever means necessary to continue using or to resume using Panasonic's own IFE software solutions, rather than CoKinetic's AirPlay software.  And that is exactly what happened with respect to Emirates, Air New Zealand, and United Airlines—each of them eventually electing to drop AirPlay and migrate back to Panasonic's IFE software and software services.

237.    Second, Panasonic breached Section 2.1 of the Co-Marketing Agreement by failing to act in good faith and use best efforts to collaborate with CoKinetic to sell AirPlay to new Panasonic hardware customers and ensure that CoKinetic kept its relationship with the airline customers that it secured independently—specifically, Virgin America, Virgin Australia Airlines Pty Ltd. ("Virgin Australia"), and Delta.

238.    For example, Panasonic repeatedly sabotaged CoKinetic's relationship with Virgin America.  To illustrate, in February 2015, Virgin America employee, Ken Bieler, advised CoKinetic that a video stuttering issue had suddenly appeared on Virgin America's aircraft.  Mr. Bieler further advised CoKinetic that Panasonic claimed this was the result of a hardware limitation and the only solution was to upgrade the hardware.

239.    CoKinetic advised Mr. Bieler in response that this exact same issue had appeared on Delta aircraft in 2012, and had already been conclusively proven to Panasonic to be the result

of changes deliberately made to the Linux-Based Panasonic Core Software and deployed to the Delta platform.

240.    Mr. Bieler subsequently confirmed that this was the case with Virgin America as well, and that in fact the video stuttering issue had been caused by an undisclosed change to the Linux-Based Panasonic Core Software.  On information and belief, Panasonic deliberately and maliciously made this change to the Linux-Based Panasonic Core Software on Virgin America aircraft to sabotage Virgin America's hardware and software performance.

241.    On information and belief, Panasonic ultimately induced Virgin America to drop AirPlay by providing a steep discount on Panasonic's new IFE hardware system, on the condition that Virgin America agree to drop CoKinetic's AirPlay software in favor of Panasonic's IFE software, which Panasonic falsely promised would deliver all of the features and functionalities that Virgin America's IFE system had using AirPlay.

242.    On information and belief, Panasonic has been unable to deliver fully functioning software to Virgin America for more than two years, including even basic payment processing for IFE transactions like food ordering—functionality that CoKinetic was able to deliver to Virgin America more than a decade ago.

243.    On information and belief, Panasonic is paying Virgin America millions of dollars per year to compensate it for continuing to use Panasonic's IFE software, rather than returning to CoKinetic's AirPlay software.

244.    Similarly, Panasonic made false and defamatory statements concerning CoKinetic to other airline customers, including Virgin Australia, which Panasonic falsely told to avoid doing business with CoKinetic because it was in financial trouble and because AirPlay would not be compatible with Panasonic IFE hardware.

245.   Panasonic also failed to use best efforts and instead sought to sabotage CoKinetic's relationship with Delta, all with the goal of inducing Delta to drop AirPlay in favor of Panasonic's IFE software.

246.   To this day, Panasonic continues to be in breach of its obligations to CoKinetic under the Co-Marketing Agreement by, among other things, continuing to refuse to use its good faith and best efforts to promote and sell AirPlay to airline customers.

247.   On October 3, 2016, CoKinetic provided Panasonic yet again "with formal written notice of its breach of the [Co-Marketing] Agreement," by, among other things, consistently failing to use "best efforts" to sell AirPlay to customers and "directly thwarting the sale of AirPlay to Panasonic customers."

248.   Accordingly, CoKinetic seeks to compel Panasonic in this action to specifically perform its obligations under the Co-Marketing Agreement, and CoKinetic also seeks to recover damages in an amount to be determined at trial as a result of Panasonic's material breaches.

**K.**   **Panasonic's Tortious Interference with CoKinetic's Existing Contractual Relationship with Delta**

249.   As discussed above, Panasonic has repeatedly interfered with CoKinetic's existing contractual relationships, including most egregiously with respect to Delta.

250.   By way of background, beginning in 2008, CoKinetic and Panasonic began negotiations on the joint development of a comprehensive advertising and applications delivery platform for the in-flight industry called Marketplace.

251.   The Marketplace negotiations arose in response to Panasonic's continued anticompetitive conduct and breaches, and were intended to address CoKinetic's notices of breach and remedy Panasonic's failure to properly perform.

252.    Panasonic negotiated the Marketplace deal with CoKinetic for more than a year, repeatedly dragging out discussions up until the point that CoKinetic would threaten to walk away, until finally the agreement was at last fully drafted and finalized in July 2010, at which time Panasonic's United States-based management told CoKinetic that the deal was approved, pending "final approval" from Panasonic's headquarters in Japan.

253.    The unexecuted Marketplace contracts agreed to by the parties contemplated that Panasonic would make an eight-figure upfront license fee payment to CoKinetic, in exchange for an exclusive and unlimited license to AirPlay.  As part of the agreement, CoKinetic was also to shift its IFE business from independent software services to a revenue-sharing model based on the joint development of an "application store . . . to market, display, and distribute software applications to Customers . . . comprised of a . . . Panasonic-branded and controlled website to be developed by CoKinetic . . . that enables Customers to select those applications to be deployed to their IFE interactive platform through the App Store's content management and distribution architecture to be developed by CoKinetic."

254.    After several months of delay, in late October 2010, Panasonic finally claimed that it was unable to obtain approval from Japan to license the AirPlay software as agreed in the Marketplace contracts, and now wanted to start discussions all over again and negotiate a different deal for CoKinetic to build and operate some form of an app store.

255.    At this point, CoKinetic realized that Panasonic once again had no intention of entering into or performing any real agreement with CoKinetic.  Rather, Panasonic was negotiating the Marketplace in bad faith, as a subterfuge to distract CoKinetic and consume resources, all while Panasonic secretly worked to develop new IFE software, which Panasonic

hoped would mirror AirPlay capabilities, while executing on its scheme to cause Emirates, United Airlines, and Air New Zealand to discontinue using AirPlay.

256.    As a result, CoKinetic was forced in late 2010 to launch its own advertising and content management solution called "OpenIFE," and shortly thereafter, CoKinetic began direct negotiations with Delta, which was interested at the time in developing a new model for IFE advertising and transactional opportunities while revamping its IFE platform.

257.    Delta management made clear to CoKinetic that it was sick and tired of dealing with Panasonic's monopolistic control over IFE software services and preferred to begin working directly with CoKinetic.  Accordingly, on May 16, 2011, CoKinetic and Delta entered into the OpenIFE Agreement.

258.    Pursuant to the OpenIFE Agreement, CoKinetic agreed to provide its OpenIFE service, and in return CoKinetic and Delta agreed to share certain advertising and transactional revenue generated on Delta's IFE system.

259.    Just as Virgin America had done several years earlier, Delta specifically advised Panasonic that it had entered into a contract with CoKinetic to independently pursue advertising and transactional opportunities using AirPlay, and warned Panasonic that Delta expected full cooperation from Panasonic.

260.    Not surprisingly, Panasonic did exactly the opposite, and ultimately tortiously interfered with CoKinetic's contractual relationship with Delta, not only by defaming CoKinetic, but also by actively sabotaging Delta's IFE hardware as well as the performance of CoKinetic's AirPlay software.

261.    Among many other things, Panasonic tortiously interfered with CoKinetic's relationship with Delta by once again deliberately making constant changes to the Linux-Based

Panasonic Core Software without informing CoKinetic of the changes, just as it had done with Emirates, purposely and maliciously damaging the performance of Delta's IFE hardware in order to sabotage AirPlay.

262.   Indeed, a Panasonic employee, Sebastien Page, accidently admitted on a conference call with Delta and CoKinetic that Panasonic was basically making changes to the Linux-Based Panasonic Core Software "every two weeks."

263.   Stunned by this disclosure, Delta staff expressed dismay at how CoKinetic could possibly keep its AirPlay software compatible with Panasonic's IFE hardware, especially since the Panasonic changes were undisclosed and undocumented.

264.   On information and belief, Mr. Page was never allowed by Panasonic to participate in conference calls with Delta and CoKinetic again.

265.   Likewise, despite its contractual obligations to CoKinetic under the Panasonic SLA and notwithstanding its repeated promises to Delta to cooperate, Panasonic refused to provide CoKinetic with access to the source code for the Linux-Based Panasonic Core Software, and repeatedly thwarted and interfered with CoKinetic's ability to make AirPlay compatible with Panasonic's hardware.

266.   Equally egregious, Panasonic cut off CoKinetic's access to Panasonic modems on the Delta program altogether, without explanation or justification, which prevented CoKinetic from uploading media content, including advertising, to Delta planes wirelessly, thus forcing CoKinetic to hire "runners" to physically enter planes to manually upload all new media and software updates—multiplying CoKinetic's expenses, and harming Delta's ability to effectively and profitably deploy advertising.

267.    Indeed, former Panasonic employee Michael Dierickx would later disclose to CoKinetic that Panasonic's program manager, Mike Easterling, had explicitly directed Panasonic's staff at the Delta racks to permanently block any testing of modems for Delta aircraft during ATP testing, and further instructed staff to make false technical objections concerning the use of modems with CoKinetic's software regardless of any documentation provided by CoKinetic.

268.    According to Mr. Dierickx, Panasonic blocked the use of modems for Delta aircraft in order to deliberately interfere with the deployment of media and advertising on the Delta program and interfere with credit card processing onboard, which was being processed for Delta by CoKinetic.  Panasonic's interference forced Delta and CoKinetic to incur additional expenses and resulted in decreased revenue, ultimately thwarting the entire success of the Delta program by preventing modems from ever being utilized.

269.    Panasonic also repeatedly blamed CoKinetic for errors and bugs occurring on Delta's IFE system, even though in reality, Panasonic was the cause of, and often was purposely causing, the issue.  To illustrate, beginning in August 2012, Delta became aware of video stuttering and pausing on its IFE hardware systems, causing significant interference with passenger experience across several fleets.

270.    Despite knowing that the video stuttering and pausing issue was impacting other airlines that were not running on CoKinetic's AirPlay software, Panasonic hid this fact from Delta and continued to blame CoKinetic for the issue.

271.    After more than a year of deception and blame-shifting, Panasonic finally agreed in October 2013 to run a comprehensive troubleshooting test onboard a Delta aircraft as well as at the Delta racks in Lake Forest, CA, which confirmed that the stuttering issue arose solely due

to a change Panasonic made to the Linux-Based Panasonic Core Software prioritizing the allocation of video streams to specific cabins—a change Panasonic intentionally made and maliciously failed to communicate to CoKinetic.

272.    Likewise, on June 12, 2013, Panasonic reported to Delta numerous serious performance issues with the IFE system on a newly upgraded Delta A330 aircraft—an aircraft that happened to be slated for an important in-flight demonstration with senior Delta executives on June 23, 2013.

273.    Panasonic first attempted to blame CoKinetic for the performance issues by releasing an initial report referencing unsuccessful uploading of an ad package and issues with the volume of both the boarding music and the safety video, which proved false when it was revealed on a June 14, 2013 call with Panasonic, Delta, and CoKinetic, that the CoKinetic software had nothing to do with onboarding music.

274.    Panasonic next sought to blame CoKinetic for performance issues during a fly-along by Panasonic on the same aircraft.  Specifically, on June 22, 2013, Delta wrote that "[n]ewly modified (Lie flat) acft 3351 has significant issues with the IFE system due to what Panasonic is describing as the CoKenetics [*sic*] portion of the software."

275.    However, on June 24, 2013, an onboard investigation by CoKinetic in Atlanta revealed that Panasonic had deliberately loaded Panasonic media on to Delta's aircraft instead of loading AirPlay formatted media as required.

276.    Given Panasonic's control over the media loading on this aircraft, and in light of the fact that the aircraft was scheduled for a demonstration with senior Delta management, it is obvious that Panasonic deliberately and maliciously sabotaged the aircraft in order to harm CoKinetic and interfere with its relationship with Delta.

60

277.    The pattern of sabotage, incompetence and lack of cooperation by Panasonic continued throughout 2013, with Panasonic refusing even to provide CoKinetic with IFE performance data, which was necessary to properly analyze the issues Delta aircraft were experiencing with their IFE systems.

278.    Panasonic's refusal to provide CoKinetic with access to the IFE performance data made it impossible for CoKinetic to effectively investigate Delta's reported IFE reliability and performance issues.  After months of delays, during which Panasonic first falsely claimed that the performance data was proprietary to Panasonic and then falsely claimed that it was too labor-intensive to provide, Delta was forced to intervene in April 2013.

279.    Delta specifically instructed Panasonic to disclose to CoKinetic the requested necessary IFE performance data, which quickly proved the fact that deliberate changes to the Linux-Based Panasonic Core Software were causing the performance issues.

280.    As a result, at Delta's request, Panasonic agreed to begin providing CoKinetic with written release notes documenting any changes to the Linux-Based Panasonic Core Software running on Delta's IFE hardware systems.  Despite numerous requests from both Delta and CoKinetic, to this day Panasonic has never once provided CoKinetic with a single release note documenting any changes to the Linux-Based Panasonic Core Software running on Delta's IFE hardware system.

281.    Instead, Panasonic continued to deliberately release critical changes to the Linux-Based Panasonic Core Software without advising CoKinetic, purposely causing Delta's IFE system to repeatedly crash, all in order to deliberately and maliciously sabotage CoKinetic's software and destroy its relationship with Delta.

282.   For example, in or about 2013, Panasonic made undisclosed changes to its Linux-Based Panasonic Core Software across the Delta fleet, impacting the settings used by the IFE interactive software to access the "heartbeat," a key component of the Linux-Based Panasonic Core Software.

283.   Panasonic deliberately failed to advise CoKinetic about the change, causing a significant increase in "commanded seat resets" across Delta's fleet—*i.e.*, system crashes that require crew involvement to resolve and significantly and negatively impact airline passenger experience.

284.   Rather than take responsibility and admit what it had done, Panasonic falsely claimed to Delta that it had not made any changes to its Linux-Based Panasonic Core Software, and maliciously claimed that the issue with seat resets on Delta aircraft was being caused by CoKinetic's AirPlay software.

285.   The "heartbeat" issue had a severe impact on Delta's confidence in AirPlay and irreparably damaged its relationship with CoKinetic.   Indeed, one senior leader at Delta questioned the integrity of CoKinetic's testing and quality assurance capabilities at a forum attended by all Delta IFE stakeholders in Atlanta, GA.

286.   The "heartbeat" issue ultimately caused extensive delay in the rollout of CoKinetic's software, and required an extensive investigation that eventually proved to Delta that Panasonic had in fact made changes to its Linux-Based Panasonic Core Software, which alone had caused the seat resets.

287.   Similarly, Delta identified another technical issue on its aircraft in or about mid-2013, when the time to destination information displayed on the map screen of the IFE system began displaying all zeros to passengers.

288.   Panasonic had previously experienced this issue with several other airline customers for which it supplied both the hardware and software services, and even knew the source of the problem.  Despite irrefutably knowing this, Panasonic intentionally and maliciously withheld the information from CoKinetic and Delta, allowing the issue to persist without correction, while CoKinetic was blamed and its reputation was damaged.

289.   Withholding this information and delaying Delta's ability to resolve the issue caused further delays to the rollout of CoKinetic's software with Delta, created additional reliability concerns with Delta, and caused CoKinetic to suffer a significant loss in advertising revenue from its OpenIFE service with Delta.

290.   On information and belief, Panasonic engaged in these and other wrongful acts solely to harm CoKinetic and interfere with its contractual relationship with Delta.  Panasonic even called the FAA to falsely report that CoKinetic's use of "runners" on Delta aircraft violated FAA regulations, despite the fact that Panasonic had itself approved the loading of advertisements and updating of content via "runners," which was itself only necessary because Panasonic had deliberately thwarted testing and blocked the deployment of modems on Delta aircraft, which would have eliminated the need for "runners" altogether.

291.   In addition, starting in or about 2013, Panasonic began arbitrarily reducing the memory limitations for CoKinetic's software operating on Delta aircraft, once again without disclosing the change, and once again deliberately causing CoKinetic's software to fail, thereby further damaging CoKinetic's reputation and relationship with Delta.

292.   Further, starting in about 2014, Panasonic field engineers and technical support personnel began intimidating and interfering with the team of "runners" contracted by Delta

under the management of CoKinetic, who were utilized by Delta and CoKinetic to conduct offloads and uploads on Delta aircraft.

293.    To illustrate, Panasonic personnel would routinely turn off the power systems and unplug network cables while runners were working, deliberately sabotaging media and data transfers.  Panasonic personnel would likewise harass the runners by telling them that CoKinetic had lost the Delta contract and they would soon be fired.

294.    Also in or about Spring 2014, while CoKinetic and Delta were operating under the OpenIFE Agreement, a Delta employee, Selena Chen, inadvertently forwarded a spreadsheet to CoKinetic reflecting plans for Delta's migration from AirPlay back to Panasonic's IFE software.  On information and belief, Ms. Chen was subsequently fired for this mistake.

295.    Similarly, in June 2014, a Panasonic employee, Chiaki Maeda, posted a document to a file server shared between Delta, Panasonic, and CoKinetic.  The document was a spreadsheet reflecting plans dating back to 2013 for Delta to discontinue AirPlay and migrate back to Panasonic's IFE software.  Tellingly, just one day later, CoKinetic received a written communication from Ms. Maeda claiming that the document was inadvertently posted to the shared file server and requesting that CoKinetic delete it.

296.    Worse still, on information and belief, Panasonic again used illicit inducements, including expensive gifts, excursions and entertainment, and provided other items of significant value to Delta employees, such as television sets, in order to influence and induce Delta to discontinue using AirPlay in favor of Panasonic software and media services.

297.    Panasonic's tortious interference set forth above ultimately induced Delta to repeatedly breach its contract with CoKinetic, including by failing to deploy AirPlay on Delta

aircraft in accordance with its contractual obligations, failing to show advertising and apps on Delta aircraft using OpenIFE, and failing to secure cooperation with respect to Panasonic.

298.    CoKinetic subsequently resolved its breach claim as to Delta pursuant to the terms of an amendment to the OpenIFE Agreement, dated July 1, 2014, which remains in effect.

299.    In or about late 2015 or early 2016, Delta began migrating the IFE systems on certain Delta aircraft from CoKinetic software to Panasonic software, which it continues to be in the process of doing. Today, approximately 135 Delta aircraft continue to use CoKinetic's Airplay software, down from nearly 400 aircraft in 2016.

300.    But for Panasonic's tortious interference with CoKinetic's contractual relationship with Delta, CoKinetic reasonably expected that Delta would not have breached its obligations to CoKinetic.

**L.    Panasonic's Tortious Interference with CoKinetic's Prospective Contractual Relationships**

301.    Panasonic also tortiously interfered with CoKinetic's prospective contractual relationships, including with Delta, United Airlines, Air Canada, and Air New Zealand.

302.    First, as stated above, but for Panasonic's tortious interference with CoKinetic's relationship with Delta, CoKinetic reasonably expected that Delta would have continued in and renewed its contractual relationship with CoKinetic.

303.    Second, CoKinetic and United Airlines engaged in negotiations in or about 2011 regarding United Airlines' expanded use of AirPlay and OpenIFE. On information and belief, Panasonic actively thwarted that potential relationship. Several years later, in or about early-to-mid 2015, CoKinetic and United Airlines engaged in renewed negotiations concerning the use of AirPlay and OpenIFE in connection with new IFE hardware systems that United Airlines was in the process of acquiring.

304.    On information and belief, Panasonic quickly became aware of the potential renewed business activity in the relationship between CoKinetic and United Airlines.

305.    Subsequently, CoKinetic learned from United Airlines that a Panasonic employee, David Hollow, falsely advised United Airlines that CoKinetic was in financial trouble and going out of business.

306.    Moreover, Mr. Hollow himself told CoKinetic that AirPlay would no longer be offered through Panasonic.   Thereafter, United Airlines employee, Scott Braun, advised CoKinetic that Panasonic had informed Mr. Braun that Panasonic would not work with CoKinetic.

307.    On information and belief, Panasonic continued to defame and disparage CoKinetic to United Airlines through 2016 and refused to allow United Airlines to use AirPlay on new Panasonic IFE hardware purchases.   Indeed, United Airlines was required to purchase Panasonic's IFE software tied together with its IFE hardware.

308.    On information and belief, in or about the end of 2015 or the beginning of 2016, United Airlines accepted a large up-front cash rebate in exchange for purchasing Panasonic's IFE hardware system tied together with Panasonic's IFE software.

309.    But for Panasonic's tortious interference with CoKinetic's relationship with United Airlines, CoKinetic reasonably anticipated it would have entered into a contract with United Airlines.

310.    Third, CoKinetic engaged in discussions with Air Canada in 2014 and 2015 concerning the deployment of AirPlay on its aircraft.

311.    In March 2014, Air Canada employee, Eric Lauzon, informed CoKinetic that during one of his visits to Panasonic's headquarters in California, Panasonic employees advised

him to avoid CoKinetic because the company was in financial distress, going out of business, and the quality of its AirPlay software was extremely poor, all of which was false and highly defamatory.

312.    Subsequently, in February 2015, Mr. Lauzon advised CoKinetic that despite Air Canada's preference to use AirPlay, Panasonic had told Air Canada that the choice of software was not theirs to make and they did not have a choice as to whether or not Air Canada would use Panasonic's IFE software.

313.    But for Panasonic's tortious interference with CoKinetic's relationship with Air Canada, CoKinetic reasonably anticipated that it would have entered into a contractual relationship with Air Canada.

314.    Finally, after CoKinetic's IFE software was already installed and operating on Air New Zealand pursuant to the Panasonic SLA, Panasonic told Air New Zealand that Panasonic no longer offered AirPlay on the Panasonic platform, and that Air New Zealand should stay away from CoKinetic.

315.    Subsequently, Air New Zealand sent a request for information to CoKinetic concerning the licensing of AirPlay in connection with the purchase of additional IFE hardware, and was once again told by Panasonic that it was not offering AirPlay with its IFE hardware systems.

316.    In or about 2014, Air New Zealand informed CoKinetic that it would be dropping AirPlay in favor of Panasonic's IFE software.  But for Panasonic's tortious interference with CoKinetic's relationship with Air New Zealand, CoKinetic reasonably expected that Air New Zealand would have continued its relationship with CoKinetic.

## CLAIMS FOR RELIEF

### Count One
### Violation of Section 2 of the Sherman Act – Attempted Monopolization

317.     CoKinetic realleges paragraphs 1 through 316 and incorporates them herein by reference.

318.     Panasonic engaged in anticompetitive and exclusionary conduct, with the specific intent to destroy competition from CoKinetic and any other competitor in order to establish and maintain a monopoly in the Panasonic IFE Software and Media Services Market.

319.     Specifically intending to create and maintain a monopoly in the Panasonic IFE Software and Media Services Market, Panasonic has, among other things:

a.     denied access to the source code for the Linux-Based Panasonic Core Software, which is required for competitors in the Panasonic IFE Software and Media Services Market to provide software services compatible with Panasonic's IFE hardware;

b.     sabotaged the performance of CoKinetic's software products and services in order to prevent competition in the Panasonic IFE Software and Media Services Market;

c.     tortiously interfered with CoKinetic's existing and prospective contractual relationships in order to prevent competition in the Panasonic IFE Software and Media Services Market;

d.     made defamatory statements about CoKinetic to actual and potential CoKinetic customers in order to prevent competition in the Panasonic IFE Software and Media Services Market;

e.     engaged in unlawful tying of IFE software services to IFE hardware;

68

f.      engaged in unlawful refusals to deal; and

g.      engaged in unlawful leveraging of monopoly power in the IFE hardware market to obtain and maintain monopoly power in the Panasonic IFE Software and Media Services Market.

320.    Panasonic's actions have created a dangerous probability that it will establish a monopoly in the Panasonic IFE Software and Media Services Market, and in fact, enabled it to establish a monopoly in the Panasonic IFE Software and Media Services Market, including, on information and belief, by way of obtaining a market share in excess of 95%.

321.    Panasonic's conduct has injured competition and directly and proximately caused injury to CoKinetic's business.  As the kind of injury that the antitrust laws were intended to protect against, CoKinetic's injury constitutes antitrust injury.

322.    Panasonic has thus violated Section 2 of the Sherman Act, 15 U.S.C. § 2, and CoKinetic has standing to recover damages thereby.

323.    Accordingly, pursuant to Section 2 of the Sherman Act, 15 U.S.C.A. § 2, CoKinetic seeks injunctive relief ordering an immediate end to Panasonic's attempted and actual unlawful monopolization of the Panasonic IFE Software and Media Services Market.

324.    CoKinetic also seeks to recover compensatory damages, future damages, treble damages, and attorneys' fees for Panasonic's attempted and actual unlawful monopolization, all in an amount to be determined at trial but believed to be in excess of $100 million.

**Count Two**
**Violation of Section 2 of the Sherman Act – Monopolization**

325.    CoKinetic realleges paragraphs 1 through 324 and incorporates them herein by reference.

326.    Panasonic possesses monopoly power in the Panasonic IFE Software and Media Services Market, including, on information and belief, by way of its market share in excess of 95%.

327.    Panasonic has purposefully and willfully obtained and maintained its monopoly power in the Panasonic IFE Software and Media Services Market through exclusionary conduct and anticompetitive means.  Specifically, among other actions, Panasonic has:

    a.    denied access to the source code for the Linux-Based Panasonic Core Software, which is required for competitors in the Panasonic IFE Software and Media Services Market to provide software services compatible with Panasonic's IFE hardware;

    b.    sabotaged the performance of CoKinetic's software products and services in order to prevent competition in the Panasonic IFE Software and Media Services Market;

    c.    tortiously interfered with CoKinetic's existing and prospective contractual relationships in order to prevent competition in the Panasonic IFE Software and Media Services Market;

    d.    made defamatory statements about CoKinetic to actual and potential CoKinetic customers in order to prevent competition in the Panasonic IFE Software and Media Services Market;

    e.    engaged in unlawful tying of IFE software services to IFE hardware;

    f.    engaged in unlawful refusals to deal; and

g.      engaged in unlawful leveraging of monopoly power in the IFE hardware market to obtain and maintain monopoly power in the Panasonic IFE Software and Media Services Market.

328.    Panasonic's conduct has injured competition and directly and proximately caused injury to CoKinetic's business.  As the kind of injury that the antitrust laws were intended to protect against, CoKinetic's injury constitutes antitrust injury.

329.    Panasonic has thus violated Section 2 of the Sherman Act, 15 U.S.C. § 2, and CoKinetic has standing to recover damages thereby.

330.    Accordingly, pursuant to Section 2 of the Sherman Act, 15 U.S.C.A. § 2, CoKinetic seeks injunctive relief ordering an immediate end to Panasonic's unlawful monopolization of the Panasonic IFE Software and Media Services Market.

331.    CoKinetic also seeks to recover compensatory damages, future damages, treble damages, and attorneys' fees for Panasonic's unlawful monopolization, all in an amount to be determined at trial but believed to be in excess of $100 million.

**Count Three**
**Violation of California Unfair Competition Law (CA Bus. & Prof. Code §§ 17200 *et seq.*)**

332.    CoKinetic realleges paragraphs 1 through 331 and incorporates them herein by reference.

333.    Beginning in or about 2006, and continuing thereafter to the present day, Panasonic committed acts of unfair competition, as defined by Section 17200 *et seq*. of the California Business and Professions Code.

334.    The acts, omissions, misrepresentations, practices and non-disclosures of Panasonic, as alleged herein, constitute unfair competition by means of unfair, unlawful and/or

fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200 *et seq.*  Panasonic's actions as alleged herein constitute violations of other California laws, including among other things, defamation and tortious interference with prospective and existing contractual relations in violation of California law.

335.   CoKinetic has been damaged as a direct result of Panasonic's unfair and unlawful competition.

336.   As a result of the foregoing, CoKinetic seeks injunctive relief ordering an immediate end to Panasonic's unfair competition in the Panasonic IFE Software and Media Services Market.

337.   Pursuant to Section 17200 *et seq.* of the California Business and Professions Code, CoKinetic seeks to recover restitution damages for Panasonic's unfair competition, including its attempted and actual, unlawful monopolization of the Panasonic IFE Software and Media Services Market, defamation, and tortious interference with prospective and existing contractual relations, all in an amount to be determined at trial but believed to be in excess of $100 million.

### Count Four
### Breach of the GNU GPL

338.   CoKinetic realleges paragraphs 1 through 337 and incorporates them herein by reference.

339.   Version 2 of the GNU GPL is a valid and binding contract.

340.   CoKinetic, as a member of the public, is an intended third-party beneficiary of the GPL.

341.   Panasonic's use of the Linux-Based Panasonic Core Software is governed by Version 2 of the GNU GPL.

342.    Panasonic materially breached Version 2 of the GNU GPL by refusing to publicly disclose the source code to the Linux-Based Panasonic Core Software, even though its own right to install, use and modify the Linux Source Code is conditioned on free third-party distribution of the source code to the Linux-Based Panasonic Core Software, pursuant to Version 2 of the GNU GPL.

343.    CoKinetic has specifically requested the source code to the Linux-Based Panasonic Core Software on several occasions in 2016.  Panasonic refuses to provide CoKinetic with the requested source code.

344.    CoKinetic has suffered damages as a direct result of Panasonic's material breach of the GPL.

345.    Accordingly, CoKinetic seeks to compel Panasonic to specifically perform its contractual obligation, pursuant to Version 2 of the GNU GPL, by publicly disclosing and distributing the source code for every version of the Linux-Based Panasonic Core Software released by Panasonic.

346.    Additionally, CoKinetic seeks to recover compensatory damages for Panasonic's pervasive and ongoing material breaches of Version 2 of the GNU GPL, all in an amount to be determined at trial but believed to be in excess of $100 million.

## Count Five
## Breach of the Panasonic SLA

347.    CoKinetic realleges paragraphs 1 through 346 and incorporates them herein by reference.

348.    CoKinetic and Panasonic are parties to the Panasonic SLA, which is a valid and binding contract governed by New York law.

349.    CoKinetic performed its contractual obligations by complying with the Panasonic SLA's terms.

350.    Panasonic materially breached the Panasonic SLA by repeatedly failing to meet its obligation to provide all necessary technical materials for CoKinetic to create compatible versions of AirPlay for all current and future versions of Panasonic IFE hardware, pursuant to Section 13.1.

351.    CoKinetic has suffered damages as a direct result of Panasonic's material breach of the Panasonic SLA.

352.    Accordingly, CoKinetic seeks to compel Panasonic to specifically perform its contractual obligation to provide CoKinetic with all hardware, technical materials, documentation and support necessary for CoKinetic to create compatible versions AirPlay for all current and future versions of Panasonic IFE hardware systems, pursuant to the Panasonic SLA.

353.    Additionally, CoKinetic seeks to recover compensatory damages for Panasonic's ongoing material breaches of the Panasonic SLA, all in an amount to be determined at trial but believed to be in excess of $100 million.

## Count Six
## Breach of the Co-Marketing Agreement

354.    CoKinetic realleges paragraphs 1 through 353 and incorporates them herein by reference.

355.    CoKinetic and Panasonic are parties to the Co-Marketing Agreement, which is a valid and binding contract governed by New York law.

356.    CoKinetic performed its contractual obligations by complying with the Co-Marketing Agreement's terms.

357.     Panasonic materially breached the Co-Marketing Agreement by, among other things, failing to meet its obligation to provide best efforts to promote and sell AirPlay to airline customers pursuant to Section 2.1.

358.     CoKinetic has suffered damages as a direct result of Panasonic's material breach of the Co-Marketing Agreement.

359.     Accordingly, CoKinetic seeks to compel Panasonic to specifically perform its contractual obligations owed to CoKinetic, including its obligation to use "best efforts" to cooperate and sell CoKinetic's IFE software to Panasonic's airline customers, pursuant to the Co-Marketing Agreement.

360.     Additionally, CoKinetic seeks to recover compensatory damages for Panasonic's ongoing material breaches of the Co-Marketing Agreement, all in an amount to be determined at trial but believed to be in excess of $100 million.

<u>Count Seven</u>
<u>Breach of the September 7, 2007 Letter Agreement</u>

361.     CoKinetic realleges paragraphs 1 through 360 and incorporates them herein by reference.

362.     Panasonic's express written agreement on September 7, 2007, not to disparage CoKinetic or engage in anticompetitive conduct in the future in exchange for CoKinetic's agreement to, without waiver, revoke its August 17, 2007 termination of the Panasonic SLA, is a valid and binding contract between CoKinetic and Panasonic, governed by New York law.

363.     CoKinetic performed under the contract by revoking its August 17, 2007 termination of the Panasonic SLA, without waiver, and by continuing to perform its obligations under the Panasonic SLA.

364.    Panasonic materially breached the September 7, 2007 letter agreement by, among other things, repeatedly disparaging CoKinetic and engaging in other anticompetitive conduct, as set forth herein.

365.    CoKinetic has suffered damages as a direct result of Panasonic's material breach of the September 7, 2007 letter agreement.

366.    Accordingly, CoKinetic seeks to compel Panasonic to specifically perform its contractual obligations pursuant to the September 7, 2007 letter agreement, including its obligation not to engage in anticompetitive conduct and not to disparage CoKinetic.

367.    Additionally, CoKinetic seeks to recover compensatory damages for Panasonic's material breach of its obligation not to disparage CoKinetic or engage in anticompetitive conduct pursuant to the September 7, 2007 letter agreement, all in an amount to be determined at trial but believed to be in excess of $100 million.

## Count Eight
## Tortious Interference with Existing Contracts

368.    CoKinetic realleges paragraphs 1 through 367 and incorporates them herein by reference.

369.    Panasonic is and has been aware of CoKinetic's contractual relationship with Delta through the Panasonic SLA, Co-Marketing Agreement, and Panasonic's own relationship with Delta.

370.    Panasonic took deliberate and unlawful actions with respect to Delta that were designed solely to disrupt, and in fact did disrupt, the contractual relationships between CoKinetic and Delta, including by defaming and disparaging CoKinetic and sabotaging the performance of AirPlay.

371.    Panasonic's unlawful interference was not justified and directly induced Delta to materially breach its contract with CoKinetic.

372.    But for the intentional, wrongful, and malicious acts and interference of Panasonic, CoKinetic reasonably expected that Delta would not have breached its contractual obligations with CoKinetic.

373.    As a direct and proximate result of Panasonic's tortious interference, CoKinetic suffered damages, including from Delta's material breach procured by Panasonic and with respect to its business relationship with Delta.

374.    Accordingly, CoKinetic seeks to recover compensatory damages for Panasonic's deliberate and tortious interference with CoKinetic's existing contractual relationship with Delta, all in an amount to be determined at trial but believed to be in excess of $40 million.

**Count Nine**
**Tortious Interference with Prospective Contractual Relations**

375.    CoKinetic realleges paragraphs 1 through 374 and incorporates them herein by reference.

376.    Panasonic is and has been aware of CoKinetic's actual and potential relationships with Delta, United Airlines, Air Canada, and Air New Zealand, by way of the Panasonic SLA, Co-Marketing Agreement, and Panasonic's own relationships with those customers.

377.    Panasonic took deliberate and unlawful actions with respect to Delta, United Airlines, Air Canada, and Air New Zealand, which were designed solely to harm CoKinetic and disrupt the relationship between CoKinetic and its potential customers, including by defaming and disparaging CoKinetic, and by sabotaging the performance of CoKinetic's AirPlay product.

378.    Panasonic's actions were not justified.

379.    But for the intentional, wrongful, and malicious acts and interference of Panasonic, CoKinetic reasonably expected that Delta, United Airlines, Air Canada, and Air New Zealand, each would have entered into a contractual relationship with CoKinetic.

380.    As a direct and proximate result of Panasonic's tortious interference, CoKinetic suffered damages to its business relationships.

381.    Accordingly, CoKinetic seeks to recover compensatory damages for Panasonic's deliberate and tortious interference with CoKinetic's prospective contractual relationships with Delta, United Airlines, Air Canada, and Air New Zealand, all in an amount to be determined at trial but believed to be in excess of $100 million.

**Count Ten**
**Defamation**

382.    CoKinetic realleges paragraphs 1 through 381 and incorporates them herein by reference.

383.    Panasonic intentionally published false statements concerning CoKinetic to United Airlines in 2015.  In doing so, Panasonic intentionally informed United Airlines that CoKinetic's software was not compatible with and would not work properly on Panasonic hardware, and warned them to stay away from doing business with CoKinetic because it was having financial issues, was going bankrupt, and would soon be out of business.  All of this was malicious and false.  On information and belief, Panasonic employees repeated these false and malicious statements to United Airlines in or about the first quarter of 2016.

384.    Panasonic did not have the privilege or authorization to publish any such false statements about CoKinetic.

385.    Panasonic acted willfully and intentionally, and at the very least negligently, in publishing the false statements about CoKinetic.  Panasonic's willfulness is evidenced by its

desire to convince United Airlines to use Panasonic's IFE software as opposed to CoKinetic's AirPlay.

386.    Panasonic's false statements concerning CoKinetic injured CoKinetic's business and, therefore, constitute defamation *per se*.

387.    As a result of the foregoing, CoKinetic seeks to recover compensatory and punitive damages for Panasonic's defamatory statements made to United Airlines, all in an amount to be determined at trial but believed to be in excess of $40 million.

## JURY DEMAND

388.    CoKinetic demands a jury trial on all triable issues.

## PRAYER FOR RELIEF

**WHEREFORE,** CoKinetic prays for the following relief:

a.      under Counts One, Two, Four, Five, Six, Seven, Eight, Nine, and Ten, compensatory damages in an amount to be proven at trial;

b.      under Counts One and Two, future damages, treble damages and costs of suit, including reasonable attorneys' fees;

c.      under Counts One, Two, and Three, a permanent injunction;

d.      under Count Three, restitution damages;

e.      under Count Four, specific performance for the term of the GPL requiring Panasonic to publicly disclose the Linux-Based Panasonic Core Software;

f.      under Count Five, specific performance for the term of the Panasonic SLA requiring Panasonic to comply with Section 13.1;

g.      under Count Six, specific performance for the term of the Co-Marketing Agreement requiring Panasonic to comply with Section 2.1;

h.      under Count Seven, specific performance of the September 7, 2007 letter agreement for the term of the Panasonic SLA;

i.      under Count Ten, punitive damages;

j.      under all Counts, an award of all pre- and post-judgment interest allowed by law; and

k.      under all Counts, such additional damages and relief as the Court may deem just and proper.


Dated:      New York, New York
            March 1, 2017

Respectfully submitted,

CROSBY & HIGGINS LLP

Todd A. Higgins, Esq. (TH 7920)
477 Madison Ave., 6th Floor
New York, NY 10022
Ph: (646) 452-2300
Fx: (646) 452-2301
*Attorneys for Plaintiff*